# In the United States Court of Federal Claims

Nos. 15-215C, 15-272C, and 15-330C (consolidated)

(Filed Under Seal: May 28, 2015)
(Reissued: June 5, 2015)

| | | |
|---|---|---|
| PER AARSLEFF A/S, | ) | Consolidated post-award bid protests; limitation on competition due to international agreement; 10 U.S.C. § 2304(c); FAR § 6.302.4; inapplicability of bar on jurisdiction over actions based on treaty; 28 U.S.C. § 1502; mistake in a critical eligibility criterion; latent defect discovered by procuring agency prior to award but not corrected; considerations affecting equitable relief |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| EXELIS SERVICES A/S, | ) | |
| Defendant-Intervenor. | ) | |

Paul A. Debolt, Venable LLP, Washington, D.C., for Per Aarsleff A/S, plaintiff in No. 15-215C. With Mr. Debolt on the briefs and at the hearing was James Y. Boland, Venable LLP, Tysons Corner, Virginia. With him on the briefs was Anna E. Pulliam, Venable LLP, Tysons Corner, Virginia.

James J. McCullough, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C. for Greenland Contractors I/S, plaintiff in No. 15-272C. With Mr. McCullough on the briefs and at the hearing was Michael J. Anstett, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C. With him on the briefs were Aaron T. Tucker and Samuel W. Jack, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C.

Kevin J. Cosgrove, Hunton & Williams LLP, Norfolk, Virginia for Copenhagen Arctic A/S, plaintiff in No. 15-330C.

William P. Rayel, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the United States. With Mr. Rayel on the briefs were Benjamin C. Mizer, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., Robert E. Kirschman, Jr., Director, and Scott D. Austin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

Kevin P. Connelly, Vedder Price P.C., Washington, D.C. for Exelis Services A/S.  With Mr. Connelly on the briefs were Eric J. Marcotte, Marques O. Peterson, Kelly E. Buroker, and Caroline A. Keller, Vedder Price P.C., Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

In this tripartite bid protest, plaintiffs Per Aarsleff A/S ("Per Aarsleff"), Greenland Contractors I/S ("Greenland Contractors"), and Copenhagen Arctic A/S ("Copenhagen Arctic") challenge the decision of the United States Department of the Air Force Space Command ("Air Force" or "government") to award a contract to Exelis Services A/S ("Exelis Services") under Request for Proposals ("RFP" or "Solicitation") No. FA2523-12-R-0006 to operate, maintain, and support Thule Air Base, a United States Air Force Base located in a remote area of northwestern Greenland.  Although all four offerors in this Solicitation were rated as technically acceptable by the Air Force, Exelis Services received the contract ("Thule Contract") based upon the Air Force's evaluation that it had the lowest-price, technically acceptable proposal.

All three plaintiffs argue that the award to Exelis Services was improper because Exelis Services is a wholly owned Danish subsidiary of an American company, and therefore, it failed to meet an eligibility requirement set forth in the RFP that limited participation to Danish or Greenlandic businesses.  Copenhagen Arctic and Greenland Contractors contend that the Air Force committed further error by failing to evaluate compliance with a requirement in the RFP that offerors maximize subcontracts from Danish and Greenlandic sources and, to the extent that using a Danish or Greenlandic subcontractor was not feasible, to justify the use of a foreign subcontractor.  Greenland Contractors also avers that the Air Force engaged in misleading discussions regarding Greenland Contractors' proposed price and failed to evaluate whether the other offerors had justified their significantly lower pricing.  In these circumstances, plaintiffs request injunctive relief setting aside the contract with Exelis Services and requiring the agency to reevaluate their proposals under the terms of the RFP, consistent with international agreements.

The protestors previously raised similar claims before the Government Accountability Office ("GAO"), which denied relief in a decision dated February 18, 2015.  *See Per Aarsleff A/S*, B-410782, et al., 2015 CPD ¶ 86, 2015 WL 1004252 (Comp. Gen. Feb. 18, 2015).

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective orders entered in these consolidated cases, it was initially filed under seal.  The parties were requested to review this order and to provide proposed redactions of any confidential or proprietary information.  The resulting redactions are shown by brackets enclosing asterisks, *e.g.*, "[***]."  Editorial changes have also been made.

Each of the three plaintiffs has submitted motions for judgment on the administrative record pursuant to RCFC 52.1(c)(1), and the government and Exelis Services have filed cross-motions for judgment. The motions have been fully briefed and were addressed at a hearing held on May 22, 2015. The case is now ready for disposition.

## FACTS[2]

### A. *Thule Air Base*

#### 1. *Location and environment.*

Thule Air Base is sited in an austere area of the world, surrounded by glaciers and North Star Bay. AR 83-4608 (Thule Air Base Acquisition Plan (approved Mar. 3, 2014)).[3] Specifically, this northernmost military installation is located in northwestern Greenland, approximately 600 miles north of the Arctic Circle and 900 miles south of the North Pole. AR 20c-668 (Contracting Officer's Statement of Facts (Dec. 12, 2014)). Due to its position within the Arctic Circle, the ground of the Air Base is permanently frozen to a depth of at least 1,000 feet throughout the year. AR 83-4607. Temperatures are severe, averaging from 0 to -30 degrees Fahrenheit during the winter months and dropping to -75 degrees Fahrenheit with wind chill. *Id.* While the days are 24 hours long from April through August, there is no sunlight between November and January. *Id.* The "storm season," in which Thule Air Base faces the most extreme weather conditions, occurs from September 15 through May 15. *Id.*

By virtue of its location, Thule Air Base offers strategic military advantages in the Arctic region. Its mission is to "provide early warning and attack assessment of ballistic missile launches, provide space surveillance data and . . . provide tracking, telemetry and command[] . . . of earth orbiting satellite vehicles." AR 88-5270 (Solicitation No. FA2523-12-R-0006). These

---

[2]The recitations that follow constitute the court's findings of fact based on the administrative record of the procurement filed pursuant to RCFC 52.1(a), *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (noting that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"), and the parties' evidentiary submissions related to prejudice and equitable relief, *see Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009) ("It is the responsibility of th[e] court, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief.") (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 567, 568 n.1 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004)).

[3]Citations to the administrative record refer to the record filed on March 18, 2015 in the protest of Per Aarsleff and the records filed on April 7, 2015 and April 15, 2015, which supplement and amend the administrative record based on the protests of Greenland Contractors and Copenhagen Arctic, respectively, and with further relevant materials located by the agency. The record is paginated sequentially and is also divided into tabs. In citing to the administrative record, the court will first designate the tab, followed by page number, *e.g.*, AR 83-4608 refers to page 4608, which is located in tab 83 of the record.

responsibilities specifically include "sea-launched and intercontinental ballistic missile attack warning and assessment for the 21st Space Wing (21 SW), space surveillance for 21 SW, and satellite telemetry, tracking, and command for the 50th Space Wing (50 SW)." AR 83-4603.  In addition, Thule Air Base supports both the Canadian and Danish Arctic weather stations.  *Id.*  The Arctic environment also makes Thule Air Base a suitable location for a variety of Arctic research operations conducted by agencies of the United States, foreign governments, academia, and private entities.

The Defense Area of Thule Air Base is approximately 275 square miles.  AR 83-4608.  The Defense Area and adjacent land lack paved roads and amenities common on most military installations, such as banks, a commissary, and fast food chains.  *Id.*  There is no "downtown" area and the closest village, Qaanaaq (population 700), is located 75 miles away, accessible by helicopter or dogsled during the winter and by boat during the summer.  AR 83-4648.  Unlike a majority of bases serving the United States military, all personnel supporting Thule Air Base live within the Thule Defense Area in facilities provided by the United States government.  *Id.*  Thule Air Base houses 700 to 900 individuals, with the highest number of staff living on the base during the summer construction season.  AR 83-4603.

Given the harsh Arctic environment, profound logistical challenges arise in supplying fuel, materials and non-perishable items to individuals working and living on Thule Air Base.  AR 83-4608.  The seaport is only available during several summer months; for the remaining months, airlift is the sole type of transportation to and from the base.  *Id.*  Thule Air Base has a lengthy runway that is not always fully available.  Prelim. Inj. Hr'g Tr. 103:8-23 (Apr. 2, 2015).[4]  Specifically, large planes will be unable to land at Thule Air Base this summer.  Prelim. Inj. Hr'g Tr. 104:3-10.[5]  Also, flight delays and cancellations are not infrequent during the winter, which can "result[] in passengers, cargo (including mission-critical parts and subsistence) being stranded at the originating or en-route airport."  AR 83-4608.

### 2.  *Bilateral agreements and understandings.*

With the exception of foreign policy and defense, which is within the competence of the Kingdom of Denmark, Greenland is a self-governing entity of the Danish government.  AR 83-4606.  Thule Air Base was created pursuant to the 1951 Defense of Greenland Agreement ("1951 Agreement") between the governments of the United States and Denmark.  *See* AR 83-4765 (Defense of Greenland Agreement, 2 U.S.T. 1485 (signed Apr. 27, 1951 and effective June 8, 1951)).  "The 1951 Agreement is the foundational agreement for the presence of the U.S. armed forces in Greenland and was entered into . . . 'in accordance with the principles of self-help and mutual aid, and having been requested by the North Atlantic Treaty Organization (NATO) to negotiate arrangements under which armed forces of the parties to [NATO] may make use of

---

[4]Further citations to the transcript of the preliminary injunction hearing will omit reference to the date.

[5]Limited flights from the United States and Copenhagen, Denmark are regularly scheduled but frequently must be cancelled due to weather and other circumstances.  AR 83-4608.

facilities in Greenland in defense of Greenland and the rest of the North Atlantic Treaty area.'" AR 32-2650 ¶ 5 (Legal Opinion of Kevin A. Doherty (Jan. 26, 2015)) (citing 1951 Agreement). Under its terms, the Air Force is permitted "rent-free use of the land on which Thule Defense Area is located." AR 83-4648.

Since the inception of Thule Air Base, the United States and Danish governments have engaged in negotiations regarding contractual opportunities to support the base. *See, e.g.*, AR 20zf-1463 to 1464 (Letter from William Thurman to Air Force Regarding Danish Participation in U.S. Defense Projects in Greenland (Aug. 29, 1962)); *see also* Def.'s Opp'n to Pls.' Motions for Prelim. Inj. App. ("Def.'s Opp'n to Pls.' Mots. for Prelim. Inj.") App. at 50, ECF No. 41 (Joint Statement of the United States and the Kingdom of Denmark on the Resolution of the Thule Base Maintenance Contract Acquisition Matter (Mar. 2015) ("Joint Statement")) ("For more than 60 years, the Kingdom of Denmark, including Greenland, and the United States have cooperated to provide for the defense of Europe and North America through mutually beneficial operations at Thule Air Base.").[6]  In June of 1962, an Aide Memoire was drafted by the United States Department of State ("State Department") to explicate certain provisions of the 1951 Agreement.  AR 20zf-1465 to 1470 (Aide Memoire (June 6, 1962)).  Specifically, the Aide Memoire "[wa]s made . . . with regard to future Danish participation in work in United States defense projects in Greenland." AR 20zf-1465.  Its objective was to ensure that Danish participation in defense projects in Greenland was as great as possible and to allow Danish concerns to participate more fully in the operation of support at Thule Air Base.  AR 20zf-1467 to 1469.

In 1991, a Memorandum of Understanding between the two countries stated that "either [p]arty may award contracts to commercial enterprises for goods and services, including construction projects, in Greenland and may procure directly from any US or Danish /Greenlandic source . . . ."  Memorandum of Understanding Between the Government of the United States of America and the Government of the Kingdom of Denmark (Including the Home Rule Government of Greenland) Use of Sondrestrom Aviation Facility Kulusuk Airfield and Other Matters Related to United States Military Activities in Greenland ("1991 MOU"), art. IV, ¶ 1, Mar. 13, 1991, T.I.A.S. No. 12285.  During the years 2008 and 2009, the United States and Danish governments collaborated to amend the 1991 MOU with the following text:

> In accordance with their respective laws and regulations, either [p]arty may award contracts to commercial enterprises for goods and services, including construction projects, in Greenland, and *shall procure directly from Danish/Greenlandic sources.  When procurement from such sources is not feasible, U.S. requirements may be satisfied by procurement from U.S. or other sources.*  Either [p]arty may use its own military or civilian personnel to perform services or construction projects.

------

[6]The Joint Statement was signed during the pendency of these consolidated cases and is not part of the administrative record of the procurement.  *See* Def.'s Opp'n to Pls.' Mots. for Prelim. Inj. App. at 50.  It was provided by the government in connection with the court's consideration of equitable factors.  *See id.* at 57-58.  The Joint Statement is addressed in detail *infra*, at 19.

AR 20z-1443 (Diplomatic Note (Jan. 27, 2009)) (emphasis added).  The revision stated in the Note replaced Article IV, paragraph one of the 1991 MOU and "constitute[d] an Agreement between [the] two governments," which entered into force on January 27, 2009.  *See* AR 20z-1443 to 1444; *see also* AR 147-11598 (Thule Base Maintenance Contract Recommendation) (setting out the State Department's acknowledgment that it was "bound by the . . . language from our . . . diplomatic note to the Government of Denmark amending the language of Article IV of the March 13, 1991 [MOU] between the United States and Denmark (including Greenland).").

Consistent with these international agreements, officials from the Air Force and the State Department entered into discussions with Danish Ministry of Finance officials during the Spring of 2013 to determine whether offerors qualified as "Danish/Greenlandic sources" for the purpose of a Thule Air Base solicitation.  *See* AR 20c-673.  As the two countries were negotiating the eligibility requirements, the Danish Ministry of Foreign Affairs intimated that it would not make the eligibility determination because of obligations with European Union procurement regulations and it would likely recommend that the government of Greenland step in, since it is not part of the European Union.  *See* AR 147-11587 (E-mail from [***] to [***], *et al.* (Nov. 1, 2013)).  This recommendation presented a conflict of interest, however, because the incumbent contractor, Greenland Contractors, is partially owned by the government of Greenland.  *See id.*; *see also* AR 147-11606 (E-mail from Patrick King to [***] (Nov. 5, 2013)).

To avoid such a conflict, a State Department official at the United States Embassy in Denmark suggested establishing a "simple, transparent checklist of requirements" that could be used for making eligibility determinations.  AR 147-11586 (E-mail from [***] to [***], *et al.* (Nov. 4, 2013)) ("If the involvement of the Greenlandic government really is a showstopper, then we could look at an earlier [Air Force] concept of us establishing a simple, transparent checklist of requirements for tender participation - company must have a headquarters in the Kingdom, pay taxes in the Kingdom, bank in Kingdom, etc.").  After consulting with the Air Force, the State Department prepared a draft memorandum setting forth proposed criteria for eligibility:

> - the primary bidder must be registered as a Danish company
> with the Danish Business Authority — demonstrated by a CVR
> number . . . and a listing within the Central Business Registry
> identifying them within a legal category of Danish businesses
> (not as a subsidiary of a foreign company);
>
> - payable through a Danish bank account;
>
> - maintaining a physical[] presence in the Kingdom of Denmark.

AR 147-11600.[7]

_____

[7]"CVR" is an acronym for "Det Central Virksomhedsregister."  "The Central Business Register ('CVR') is the central register containing primary data on all businesses in Denmark,

During this time and in furtherance of its proposal to create a "simple, transparent, checklist of requirements," AR 147-11586, a State Department officer, [***], sent an e-mail to the contracting officer, Patrick King, regarding the requirements for conducting business in Denmark, AR 20f-873 (E-mail from [***] to [***], King, and Major John Schoonmaker (Nov. 4, 2013)). Mr. [***] informed Mr. King that "[i]n the searchable part of the CVR there is an information point called 'type of company/virksomhedsform' that has 'subsidiary of foreign company' as a possibility, so *there is a way to see if the company is fully registered as Danish or acting as a foreign subsidiary in Denmark*." *Id*. (emphasis added).[8] Accordingly, the United States government was under the belief, later proved to be mistaken, that registering in the CVR would permit the Air Force to determine whether an offeror was genuinely a Danish or Greenlandic entity or was merely acting as a subsidiary of a foreign company.

On November 25, 2013, the Danish Ministry of Foreign Affairs proposed criteria that would limit eligibility to Greenlandic companies: namely, "the enterprise [must be] registered . . . under the legislation applying to Greenland . . . [, t]he registered office of the enterprise [must] be in Greenland and the management of the [contract] [must] be performed in Greenland . . . [, and] [t]he enterprise [must] abide by the labour laws in Greenland." AR 147-11632 (Criteria for Greenlandic Enterprise). In response, the State Department indicated that limiting competition to Greenlandic enterprises was a "departure from the status quo and beyond what [it has] committed in [the] MOU with Denmark." AR 147-11631 (E-mail from [***] to [***], *et al.* (Nov. 25, 2013)); *see also* AR 147-11620 (E-mail from Esther McClure to Robert Borchert and John Culton (Nov. 8, 2013)) (quoting statement from Danish General Jorgen Jacobson that "[w]e want to keep the status quo concerning the spirit of the 1951 [A]greement"); AR 147-11613 (E-mail from [***] to Nauja Bianco (Nov. 7, 2013)) (reiterating the United States' "commit[ment] to sourcing from Danish/Greenlandic sources as stated in [the] MOU and [that it was] willing to adjust whatever mechanism and criteria Denmark and Greenland determine[d] [we]re most appropriate for defining these sources").

---

regardless of economic and organizational structure. [The] CVR also covers both public and private businesses." AR 20f-873.

[8]Mr. [***] is stationed at the United States Embassy in Denmark. *See* AR 251-28251 (Copenhagen Arctic's Response to Air Force Mem. of Law in the proceedings before GAO) (citing a LinkedIn Biography of Mr. [***]). Greenland Contractors contends that when looking into whether the CVR could identify a company as a subsidiary of a foreign company, Mr. [***] "mistranslated the word 'filial' in Danish to mean 'subsidiary,' when that word in fact means 'branch' or 'branch official.'" Mem. of Greenland Contractors in Support of Its Mot. for Judgment on the Admin. Record ("Greenland Contractors' Mot.") at 12, ECF No. 62-1; *see also* Copenhagen Arctic's Mot. for Judgment and Supporting Mem. on the Admin. Record ("Copenhagen Arctic's Mot.") at 17-18, ECF No. 61 (stating that two options available on the CVR form were: (1) "'[f]ilialer af udenlandske aktieselskaber' (in English: [b]ranch of a foreign owned public limited company);" and (2) "'[f]ilialer af udenlandske anpartsselskaber' (in English: [b]ranch of a foreign owned private limited company)."); *compare* http://en.bab.la /dictionary/danish-english/filial (translating the Danish word "filial" to "branch" in English), *with* http://en.bab.la/dictionary/english-danish/subsidiary (translating the English word "subsidiary" to "datterselskab" in Danish).

During a meeting held on December 2, 2013, the two countries ultimately settled on eligibility criteria to be used in a solicitation for Thule Air Base. *See* AR 20g-874 (Letter from Kim Jørgensen to the United States Embassy in Copenhagen (Dec. 9, 2013)). The agreed language was memorialized in a letter dated December 9, 2013 from the Danish Ministry of Foreign Affairs to United States Ambassador J. Rufus Gifford. *See* AR 20g-874 to 875 ("2013 Diplomatic Note"); *see also* AR 20h-888 (Letter from Gifford to Jørgensen (Dec. 13, 2013)). The 2013 Diplomatic Note acknowledged that the "strong wish of the United States [was] not to further limit the number of companies eligible to participate in the procurement." AR 20g-874. Accordingly, Danish companies would not be excluded from the competition and it "[would] hence be for the United States to assess whether a company qualifies as Danish or Greenlandic based on predefined criteria." *Id.* These criteria required an offeror to produce a signed letter from an officer of a bank within Denmark verifying that the company conducts business with that institution and to submit a corporate certificate verifying that the company is registered as a business in Denmark. AR 20g-874 to 875. The letter expressly stated that "THE ENTERPRISE . . . SHALL NOT BE REGISTERED AS A SUBSIDIARY OF [A] FOREIGN COMPANY." AR 20g-875 (emphasis in original).

The underlying purpose of the criteria "[wa]s to ensure Greenland and Greenlandic society greatest possible benefits from the agreement." AR 20g-874; *see also* Per Aarsleff's Compl. Attach. D (Decl. of Amb. Jonas Bering Liisberg ("Liisberg Decl."), ¶ 24 (Mar. 2, 2015)). The Under-Secretary for Legal Affairs in Denmark, Ambassador Liisberg,[9] has confirmed the Danish government's understanding that these eligibility criteria "notif[ied] all interested offerors that the *Thule Contract could not be lawfully awarded to a registered Danish company owned and controlled by a foreign company*." Liisberg Decl. ¶ 25 (emphasis added); *see also id.* ¶ 48 ("The language in the 2013 letters plainly excludes all registered Danish companies that are owned and/or controlled by [a] foreign company. The language serves the purpose of ensuring . . . that eligible companies for the Thule Contract not only have a formal link by registration to Denmark or Greenland, but a real and genuine link, avoiding shell companies owned and controlled by foreign companies.").

### B.   *Request for Proposals*

1. *Draft solicitation.*

The Air Force issued a draft solicitation in December 2013 that included the eligibility criteria to which Denmark and the United States had agreed. *See* AR 75-4162 (Draft Solicitation No. FA2523-12-R-0006 (Dec. 5, 2013)); *see also* AR 8-548 (Decl. of Carlo Mosca (Dec. 14, 2014)) (stating the administrative contracting officer's acknowledgement that "I do not speak Danish and I am not versed in our treaty obligations under international law. As a result, I determined it was appropriate to rely upon the language provided to [me] by the Danish government for inclusion in the RFP without altering it."). As set forth in Section L-6 of the

---

[9]"In [his] role as Under-Secretary for Legal Affairs, [Ambassador Liisberg] advise[s] the Minister for Foreign Affairs of Denmark on legal matters." Liisberg Decl. ¶ 1.

draft solicitation, responsive proposals were required to include:

> 2) Corporation certificate (Selskabscertifikat m. oblat) verifying that your company is registered as a business in the Kingdom of Denmark. (Det Central Virksomhedsregister (CVR); Det Grønlandske Erhervsregister (GER); Skráseting Føroya (Skrás. Nr.))
> NOTE: THE REGISTERED OFFICE OF THE ENTERPRISE SHALL BE IN THE KINGDOM OF DENMARK AND SHALL NOT BE REGISTERED AS A SUBSIDIARY OF FOREIGN COMPANY.
>
> 3) Signed letter from an officer of a bank within the Kingdom of Denmark verifying that your company conducts business with that institution.
> NOTE: ELECTRONIC FUNDS TRANSFER OF INVOICE PAYMENTS WILL ONLY BE MADE TO A BANK IN THE KINGDOM OF DENMARK.

AR 75-4162; *see also* AR 75-4155 (setting out Section L-3 of the draft solicitation, limiting "participation in this acquisition . . . to Danish/Greenlandic enterprises.").

Prospective offerors responded with questions to the Air Force regarding the eligibility requirements. On December 10, 2013, the Air Force received the following inquiry: "What do you mean by 'not be registered'?" AR 20e-826 (Draft RFP Question and Answer ("RFP Q&A")). Relying solely on the e-mail from an official from an official in the State Department, *see supra*, at 7, and without taking steps to verify the accuracy of the statement in the e-mail, the Air Force posted an answer stating that "[i]n the searchable part of the CVR there is an information point called 'type of company/virksomhedsform' that has 'subsidiary of foreign company' as a possibility, so there is a way to see if the company is fully registered as Danish or acting as a foreign subsidiary in Denmark." *See* AR 20e-826 (RFP Q&A); *see also* AR 20c-674. On January 28, 2014, a prospective offeror requested that the Air Force "provide further clarification as to what a 'Danish Enterprise' is as will be interpreted by the US Air Force." AR 20e-827 (RFP Q&A). The Air Force responded that "[t]o be eligible for award, an offeror must present: [the documents set forth in Section L-6 of the draft solicitation]." *Id.* Finally, on February 13, 2014, Exelis Services' initial Danish teaming partner, Danbor A/S ("Danbor"), posed the following question:

> If the Danish registered company is owned by a foreign company but still can provide following:
>
> 1.  Corporate certificate ver[i]fying that your company is regist[e]red as a business in the Kingdom of Denmark[;]

2.  Signed letter from an officer of a bank within the [K]ingdom of
    Denmark verifying that your company conducts business with
    that institution[; and]

*3.  In the CVR register your company is registered as a A/S
    (limited company)*[;]

Will [that company,] based on above[,] be eligible for award?

AR 271-2873 (Danbor Question and Answer ("Danbor Q&A") (Feb. 13, 2014)) (emphasis
added).[10]  The Air Force did not answer this inquiry in the affirmative, but instead it again copied
the eligibility requirements from Section L-6 of the draft solicitation.  *See id.*  Together, these
responses show the Air Force's understanding that the CVR database would permit it to identify
companies "acting as a foreign subsidiary in Denmark," *see* AR 20e-826 (RFP Q&A), so it could
exclude those entities from the procurement.  Moreover, the Air Force's response to Danbor
suggests that a "company . . . owned by a foreign company" would not meet the RFP's
requirement even if it was "registered as a [Danish company]."  *See* AR 271-2873 (Danbor
Q&A).[11]

2.  *Final solicitation.*

On March 28, 2014, the Air Force issued RFP No. FA2523-12-R-0006 to obtain
operation, support, and maintenance services at Thule Air Base.  The services include "supply
and purchasing, fuels management, airfield and airport operations, air traffic and transportation
management, water port operations, civil engineering operations, vehicle operations and
maintenance, fire protection, environmental management, health services, food services,

---

[10]The Danbor Q&A was not part of the administrative record in the proceedings before
GAO.  It was made part of the record in response to a letter from Per Aarsleff's counsel dated
April 6, 2015, to the government's counsel, requesting that the Air Force complete the
administrative record.  *See* Per Aarsleff's Mot. for Judgment on the Admin. Record and Request
for Permanent Inj. ("Per Aarsleff's Mot.") Ex. A, at 2, ECF No. 60 (Letter from William Rayel
to Paul Debolt (Apr. 10, 2015)).  According to the Air Force, it had "inadvertently failed to post
[the Danbor Q&A] with the other questions and answers . . . [even though it was] the Air Force's
final answer."  *Id.*

[11]The Air Force's acquisition plan prepared prior to the issuance of the RFP, but
approved on March 3, 2014, further indicates that the eligibility criteria were intended to exclude
non-Danish and non-Greenlandic firms.  *See* AR 20zg-1501 ("Market research . . . indicates that
capable Danish/Greenlandic sources exist for the subject requirement; therefore, *this acquisition
will be limited to Danish/Greenlandic sources.*") (emphasis added); AR 20zg-1521 ("*Non-
Danish or non-Greenlandic firms (less than 49% ownership)* interested in subcontracting or joint
ventures opportunities have been encouraged to contact potential Danish or Greenlandic prime
contractors that may be interested in participating in this requirement.") (emphasis added); *see
also* AR 83-4600, 4669.

recreation and community services, and non-sensitive communication management." AR 88-5143. The statutory authority for the Solicitation included 10 U.S.C. § 2304(c)(4), limiting competition because of an international agreement,[12] as implemented by provisions of the Federal Acquisition Regulations ("FAR"). *See* 48 C.F.R. ["FAR"] § 6.302-4.[13]

─────────────────

[12]Subsection 2304(c) of Title 10 of the United States Code provides in part:

> (c) The head of an agency may use procedures other than competitive procedures only when . . .

> (4) the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures[.]

10 U.S.C. § 2304(c).

[13]FAR § 6.302-4 states, in relevant part:

> (a) Authority. . . .

>> (2) Full and open competition need not be provided for when precluded by the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the acquisition of the supplies or services for such government.

> (b) Application. This authority may be used in circumstances such as—

>> (1) When a contemplated acquisition is to be reimbursed by a foreign country that requires that the product be obtained from a particular firm as specified in official written direction such as a Letter of Offer and Acceptance; or

>> (2) When a contemplated acquisition is for services to be performed, or supplies to be used, in the sovereign territory of another country and the terms of a treaty or agreement specify or limit the sources to be solicited.

The RFP sought a hybrid firm-fixed-price contract, comprising economic-price-adjustment and cost-reimbursable contract line items to be awarded on a low-price, technically acceptable ("LPTA") basis, as governed by FAR Part 15, Contracting by Negotiation.  *See* AR 88-5143, 5251; *see also* FAR §§ 15.000-.609.  Regarding technical acceptability, the RFP provided that an offeror was required to be acceptable under the following seven technical sub-factors: (1) program management; (2) infrastructure operation and maintenance plan; (3) logistics plan; (4) vehicle/equipment replacement plan; (5) resource utilization plan; (6) downward pricing; and (7) experience.  AR 88-5256 to 5258.  An unacceptable rating under any one of the sub-factors would result in an offeror's proposal being rated technically unacceptable.  *See* AR 88-5261 to 5262.  The RFP further stated that an offeror's proposed price had to be "reasonable, affordable[,] and balanced," pursuant to the price-analysis techniques outlined in FAR § 15.404-1.  AR 88-5265; *see also* FAR § 15.404-1 (titled "Proposal analysis techniques").  In Section M of the RFP, offerors were also "advised to *clearly show justification for unique practices that significantly lower pricing*."  AR 88-5265 (emphasis added).  They were warned that "[a]n assessment that the proposal is not reasonable or affordable w[ould] result in the offer being unacceptable for award."  *Id.*

The eligibility criteria remained the same as those requirements recited in the draft solicitation:

### L-3. OFFEROR ELIGIBILITY

Participation in this acquisition is limited to Danish/Greenlandic enterprises.  Enterprises must possess a corporation certificate (Selskabscertifikat m. oblat) verifying the company is registered as a business in the Kingdom of Denmark (Det Central Virksomhedsregister (CVR); Det Grønlandske Erhervsregister (GER); Skráseting Føroya (Skrás. Nr.)). NOTE: THE REGISTERED OFFICE OF THE ENTERPRISE SHALL BE IN THE KINGDOM OF DENMARK AND SHALL NOT BE REGISTERED AS A SUBSIDIARY OF FOREIGN COMPANY. Enterprises must produce a signed letter from an officer of a bank within the Kingdom of Denmark verifying the company conducts business with that institution.  NOTE: ELECTRONIC FUNDS TRANSFER OF INVOICE PAYMENTS WILL ONLY BE MADE TO A BANK IN THE KINGDOM OF DENMARK.

AR 88-5252 to 5253 (emphasis in original).  Those criteria were restated in Section L-6 of the RFP, which provided:

---

FAR § 6.302-4(a), (b); *see also Hyperion, Inc. v. United States*, 120 Fed. Cl. 504, 511-14 (2015) (giving effect to the "International Agreement" exception to the Competition in Contracting Act, 10 U.S.C. § 2304(c)(4), and FAR § 6.302-4).

**L-6. INFORMATION TO OFFERORS (ITO) AND INSTRUCTIONS FOR PROPOSAL PREPARATION . . . (IPP) . . .**

**b. Contract Documents.** As part of the proposal submission, include the following . . .

2) Corporation certificate (Selskabscertifikat m. oblat) verifying that your company is registered as a business in the Kingdom of Denmark. (Det Central Virksomhedsregister (CVR); Det Grønlandske Erhervsregister (GER); Skráseting Føroya (Skrás. Nr.))
NOTE: THE REGISTERED OFFICE OF THE ENTERPRISE SHALL BE IN THE KINGDOM OF DENMARK AND SHALL NOT BE REGISTERED AS A SUBSIDIARY OF FOREIGN COMPANY.

3) Signed letter from an officer of a bank within the Kingdom of Denmark verifying that your company conducts business with that institution.
NOTE: ELECTRONIC FUNDS TRANSFER OF INVOICE PAYMENTS WILL ONLY BE MADE TO A BANK IN THE KINGDOM OF DENMARK.

AR 88-5253, 5259 (emphasis in original).  Also, Section L of the Solicitation included a provision governing staffing.  There, the Solicitation explained that in accordance with agreements between the United States and the Kingdom of Denmark, "personnel working at Thule [Air Base] must be Danish, Greenlandic or American citizens, and must adhere to Danish/Greenlandic labor law."  AR 88-5257.

Of further relevance in this bid protest, a provision of the Performance Work Statement ("PWS") was incorporated in Section H-6 of the Solicitation, which read as follows:

**H-6. STATUTORY RESTRICTIONS ON FOREIGN ACQUISITIONS**

The requirements at PWS 3.1.16 to maximize and document contract related purchases and subcontracts for Danish and Greenlandic sources required by the 1962 International Agreement (Aide Memoire) between the US and Denmark take precedence in the performance of this contract.  Products not acquired by Danish and/or Greenlandic sources must be procured [in accordance with] the following FAR/[Defense Federal Acquisition Regulation Supplement ('DFARS')] clauses if applicable:

> Procurement of Biobased Products shall utilize FAR CLAUSE
> 52.223-2. The Contractor shall notify the Contracting Officer when
> purchase of Biobased products cannot be acquired from U.S.
> sources as and when needed in a satisfactory quality and sufficient
> quantity at market prices and take action in accordance with the
> Contracting Officer's direction.
>
> The Contractor agrees to deliver to the Government items that
> comply with the requirements of [DFARS] clauses 252.225-7012,
> and 252.225-7030 in Section I of this contract.
>
> Delivery is defined as transfer of title from the contractor to the
> Government or incorporation of Contractor-owned material or
> parts into Government-owned property.

AR 88-5227 to 5228 (emphasis in original); *see also* AR 88-5279 (setting out PWS 3.1.16, as incorporated into Section H of the RFP, requiring a contractor to "*[m]aximize and document* contract-related purchases and *subcontracts from Danish and Greenlandic sources*" and to "*document and justify any exceptions*") (emphasis added).[14]  While maximizing Danish and Greenlandic subcontracts "t[ook] precedence in the performance of [the Thule C]ontract," AR 88-5279, "[n]on-Danish or non-Greenlandic firms interested in subcontracting or joint venture[] opportunities [were nevertheless] encouraged to contact potential Danish or Greenlandic prime contractors," AR 54-2912 (Solicitation Synopsis (created May 16, 2012 and modified Mar. 19, 2013)); *see also* AR 20zg-1521.

## C.   *Evaluation of Offers*

### 1.   *Offerors.*

Four offerors—Exelis Services, Per Aarsleff, Greenland Contractors, and Copenhagen Arctic—submitted timely proposals in response to the Solicitation.  *See* AR 20u-1419 (Source Selection Decision Document (Oct. 21, 2014)).  Greenland Contractors is registered as a Danish partnership, *i.e.*, an "Interessentskab" or "I/S," and is owned in part by the government of Greenland.  *See* Prelim. Inj. Hr'g Tr. 61:13-16.  Greenland Contractors is the current contractor for Thule Air Base operation and maintenance, and it has been the incumbent contractor for the base since 1972.  Greenland Contractors' Compl. ¶ 10.  Each of the other offerors, Per Aarsleff, Copenhagen Arctic, and Exelis Services, is registered as a Danish limited company, *i.e.*, an "Aktieselskab" or "A/S."  *See* AR 20s-1280 (Legal Registration Certificate for Exelis Services (Apr. 29, 2014)); *see also* AR 20zh-1525 (Mem. from René Streander to King (May 11, 2014)); *see also* Def.'s Opp'n to Mots. for Prelim. Inj. at 13.  Exelis Services was established in Denmark in April 2014, Copenhagen Arctic was established in March 2014, and Per Aarsleff

---

[14]The language of the 1962 Aide Memoire was not incorporated directly into the solicitation, *see* AR 20c-674, but the Aide Memoire was acknowledged in Section H-6, *see* AR 88-5227, as guiding a performance requirement concerning "[m]aximiz[ing] . . . contract-related purchases and subcontracts from Danish and Greenlandic sources," *id.*

was established in December 1961. AR 20zh-1525.[15]  For the purposes of this procurement, Per Aarsleff listed an American company, [***], as a subcontractor, *see* AR 98-6449 to 6450 (Mem. to King Regarding Contracting Squadron (May 11, 2014)), and Copenhagen Arctic's proposal included the United States-based entity, [***], AR 168-14312, 14319 (Presentation of Copenhagen Arctic and Partners).

Although a Danish-registered enterprise, Exelis Services is a wholly-owned subsidiary of Vectrus Systems Corporation (formerly known as Exelis Systems Corporation) ("Vectrus"), a United States-based company. *See* Rule 7.1 Disclosure Statement of Def.-Intervenor Exelis Services, ECF No. 20 (No. 15-215) (certifying that "Vectrus Systems Corporation is Exelis Services A/S' sole corporate parent, owning 100% of its stock"); *see also* AR 251-28526 (Notice of Award (Oct. 31, 2014)) ("On October 31, 2014, a Danish company owned by Vectrus was awarded a $411M base maintenance contract. . . . Work will be performed at Thule Air Base, Greenland and is expected to be complete by September 30, 2022.").[16]  In addition, the administrative record manifestly shows that the Air Force was aware of Exelis Services' status as a foreign subsidiary when making the award decision. *See, e.g.*, AR 145-11033 (Letter from [***], general counsel for Exelis Systems Corporation, to King (June 16, 2014)) (stating in a letter to the contracting officer that Exelis Services is "a wholly-owned subsidiary of [Vectrus] Systems Corporation"); AR 21e-2216 (Letter from Streander to Exelis Services (Sept. 17, 2014)) (reciting the Air Force's acknowledgement of "the delivery/receipt of [Vectrus] Systems Corporation's submission for Thule [Air] Base Maintenance Contract."); AR 142-10808 (setting out the Defense Contract Management Agency's report stating that "Exelis Services A/S was established in April 2014 and is a wholly-owned subsidiary of Vectrus Systems Corporation (legacy Exelis Systems Corporation)"); AR 145-11105 to 11106, 11110  (Vectrus, Inc. Form 8-K (Oct. 31, 2014)) (posting a request from [***] of Vectrus that the contracting officer approve a draft of the company's Securities and Exchange Commission Form 8-K, which stated that "[o]n

---

[15]"Copenhagen Arctic is a Joint Venture (JV) established by the Danish company Copenhagen Group and U.S.-based DynCorp International for the sole purpose of tendering for the operation and maintenance of the Thule AB, Greenland for the USAF's Space Command/ 21st Space Wing/821st Air Base Group." AR 168-14312. Specifically, DynCorp has a thirty percent ownership in Copenhagen Arctic. *See* Defendant-Intervenor Exelis Services' Cross-Mot. for Judgment on the Admin. Record ("Exelis Services' Cross-Mot."), at 3, ECF No. 65-1; *see also* Copenhagen Arctic A/S's Rebuttal Mem. in Support of Judgment on the Admin. Record ("Copenhagen Arctic's Reply") at 17, ECF No. 67.

[16]Vectrus is headquartered in Colorado Springs, Colorado and is the former Exelis Systems Corporation. In September 2014, "Exelis Systems Corporation was part of a spin-off from its parent company, Exelis, Inc. and was renamed Vectrus Systems Corporation." AR 142-10808 (Defense Contract Management Agency Financial Capability Review (Oct. 2014)). "The ownership interest of Vectrus Systems Corporation in Exelis Services A/S remained the same after the spinoff." *Id.* "Exelis Services kept the Air Force apprised of these changes during the procurement process." Exelis Services' Cross-Mot. at 22 n.9  (citing AR 21c-1550 to 1552 (Letter from [***] to King (Sept. 16, 2014))).
    For the purposes of this opinion, the court will refer to Exelis Services' current parent company as Vectrus.

October 31, 2014, Vectrus received notice of award of a $411M . . . Thule [Air] Base Maintenance Contract").

    2. *Evaluations.*

    All four proposals were initially evaluated as technically unacceptable in varying degrees due to defects related to technical sub-factors, but each was nevertheless included in the competitive range. *See* AR 103-6903-16 (Initial Evaluation Report (June 3, 2014)). The Air Force issued 85 Evaluation Notices ("ENs") to Copenhagen Arctic, 83 ENs to Exelis Services, 82 ENs to Per Aarsleff, and 54 ENs to Greenland Contractors, AR 20c-677; *see also* AR 20i-912 (Overall Evaluation Summary), and undertook oral discussions with all four offerors "to ensure complete understanding of the evaluator's concerns," AR 20c-677; *see also* AR 20k-1050 to 1057 (Letters Initiating Discussions with Offerors (June 13, 2014)). As a result of discussions, the Air Force found Greenland Contractors' proposal to be technically acceptable, while the other three proposals remained technically unacceptable. *See* AR 20m-1161 (Evaluation Summary after Discussions (July 2014)). Thereafter, the Air Force held a second round of discussions, after which it found all four proposals to be technically acceptable. *See* AR 20c-677 to 678. The Air Force then requested Final Proposal Revisions. AR 20c-678.

    During the evaluation stage of the procurement, an Air Force contract specialist contacted the Danish Ministry of Foreign Affairs for assistance in determining whether the four offerors "[could] be considered Danish Firms and not a subsidiary of a foreign firm." AR 20g-878 to 879 (E-mail from Streander to Ulrik Petersen (July 30, 2014)). The Danish Ministry of Foreign Affairs declined to "assist [the Air Force] in the assessment of the companies in question," stating that the purpose of the agreed-upon criteria was to "simplify and streamline the procedure" for determining eligibility and for the United States to determine eligibility based upon "concrete, prior defined criteria[]." AR 20g-878 (E-mail from Petersen to Streander (July 30, 2014)).[17] The Air Force subsequently sought assistance in this matter from the Danish Business Authority, whose response illuminates the salient issue in this case.[18] In an e-mail

---

    [17]The Air Force contacted the Danish Ministry of Foreign Affairs again in fall of 2014 and the Ministry responded by reiterating the eligibility criteria and asserting that "these criteria give[] the US authorities the full competence in this matter and hence, leave Danish authorities, including [t]he [Danish Ministry of Foreign Affairs], [t]he Ministry of Business and Growth[,] and [t]he [Danish Business Authority] out of the qualification process." AR 20g-886 (E-mail from Peter Larsen to King (Sept. 24, 2014)).

    [18]Greenland Contractors has provided a translation of the initial e-mail sent to the Danish Business Authority which reads, in pertinent part:

        Attached please find four CVR reports/certificates on four
        companies that are all understood to be Danish companies.

        Are you permitted to or are you able to help by confirming that
        they are in actual fact considered to be Danish companies and *not*
        *subsidiaries of foreign companies*?

dated August 6, 2014, the Danish Business Authority acknowledged that the Air Force had transmitted "[two] complete reports for two limited companies (A/S) and two confirmation[s] concerning two other companies, one limited company and one partnership (I/S)."  AR 20g-883 (E-mail from Katia Tórsheim Voltelen to Streander (Aug. 6, 2014)).  Importantly, the Danish Business Authority stated that it "*does[ not] register owners*, therefor[e] this [A]uthority cannot shed light to w[hether] or not the companies are subsidiaries of foreign companies" and suggested that the Air Force "try to look into the companies['] yearly statements in regards to ownership . . . [or] access the companies' statements via www.cvr.dk."  *Id.* (emphasis added).  This communication thus informed the Air Force that the CVR could not be used to identify foreign subsidiaries and that the Air Force was mistaken in advising potential offerors that "[i]n the searchable part of the CVR . . . *there is a way to see if the company is fully registered as Danish or acting as a foreign subsidiary in Denmark*."  *See* AR 20e-826 (RFP Q&A) (emphasis added).[19]  Despite this knowledge, there is no evidence in the record that the Air Force took action to fix its mistake as it continued with the evaluations.

Following efforts by the Air Force to have Danish authorities provide guidance on the eligibility criteria, all four offerors submitted Final Proposal Revisions by September 17, 2014.  AR 20c-678.  To "ensure[] all offerors were still eligible for award . . . [the] CVR was checked to verify that all [o]fferors were registered as a business in the Kingdom of Denmark," and it was found that "[a]ll [o]fferors . . . had offices that were legally registered as a business in the Kingdom of Denmark."  *Id.*  Not surprisingly, "[t]here was no information [in the CVR] indicating that any offeror . . . had offices *registered* as subsidiaries of a foreign company."  *Id.* (emphasis added).[20]  The Air Force ultimately concluded that all four offerors were eligible for the contract award as Danish or Greenlandic enterprises and that all proposals were technically acceptable.

---

> I do not have experience enough to judge this and need your help.
> It does look as if they are autonomous Danish companies.

Greenland Contractors' Mot. at 13 (translating AR 20g-881 (E-mail from Streander to Benedicte Schleimann (Aug. 5, 2014))) (emphasis added).

[19]The government has now conceded that it was impossible to "register" as a foreign subsidiary.  *See* Def.'s Opp'n to Pls.' Mots. for Prelim. Inj. at 22-23 ("The Air Force was mistaken in its belief that there was a way to register as a 'subsidiary of [a] foreign company' in the CVR . . . .").

[20]The Air Force's contract specialist in Denmark was asked to ensure that the eligibility criteria were satisfied and "ran every report possible in the CVR system and checked every component within those reports; there was no indication that any [o]fferor had offices that were registered as a subsidiary of a foreign company."  AR 20c-676, 681.

3. *Award.*

Exelis Services submitted the lowest-priced proposal, offering to perform the work for 2,020,333,220 Danish kroners (code, "DKK," symbol, "kr") ($363,925,645), and it received the award. AR 20c-678 to 679.[21] Per Aarsleff proposed the second-lowest price of DKK [***] ($[***]), Copenhagen Arctic proposed the third-lowest price of DKK [***] ($[***]), and Greenland Contractors proposed the fourth-lowest price of DKK [***] ($[***]). AR 20c-678.[22] The three unsuccessful bidders were notified of the award decision on October 31, 2014, and post-award debriefings were held on November 6 and 7, 2014. AR 20c-679.

Upon receiving the Thule Contract, Exelis Services immediately began the eight-month process of transitioning, or "phasing-in," its responsibilities at Thule Air Base. *See* AR 88-5153, 5217; *see also* Prelim. Inj. Hr'g Tr. 106:10 to 107:10. Exelis Services maintains that after transition of the Thule Contract, it will "[***]." *See* Exelis Services' Cross-Mot. at 22 (citing Defendant-Intervenor Exelis Services A/S' Opp'n to Pls.' Per Aarsleff A/S' and Greenland Contractors I/S' Mots. for Prelim. Inj. Attach. 1, ¶ 9 (Decl. of Karl Schmidt (Mar. 27, 2015))).[23] Exelis Services is scheduled to take over operation, maintenance, and support services from Greenland Contractors on October 1, 2015. AR 88-5153. At that time, Exelis Services will be responsible for full contract performance. *See* Prelim. Inj. Hr'g Tr. 60:16-19, 114:25-5. The Air Force, however, has the ability under FAR § 52.217-8 to extend Greenland Contractors' current contract for a six-month period at the same rates and terms as the last contract year. *See* FAR § 52.217-8 ("The [g]overnment may require continued performance of any services within the limits and at the rates specified in the contract. . . . The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months."); *see also Magnum Opus Technologies, Inc. v. United States*, 94 Fed. Cl. 512, 549 (2010) (examining FAR § 52.217-8 in a bid protest based on a solicitation by the Air Force for contracts to supply health care service providers).

---

[21]Exelis Services' proposal included: (1) a certificate from the Danish Business Authority certifying Exelis Services as a legally registered public limited company in Denmark with a report documenting its registration; and (2) a letter signed by a Danish bank confirming a business relationship with Exelis Services and stating that the account was satisfactorily maintained. *See generally* AR 20s (Exelis Services' CVR Reports); *see also* AR 20za-1449 (Nordea Bank Danmark A/S Letter (Apr. 24, 2014)).

[22]The offerors were required to submit their proposals in Danish kroners. AR 88-5223.

[23]According to Exelis Services, it "appears clear that, had the Air Force awarded the Thule Contract to Per Aarsleff, the Greenland Contractors' . . . transition pool would have become employees of [***]—a U.S. corporation—and performed the Thule [Contract] work as [***] employees." Exelis Services' Cross-Mot. at 23. Additionally, Exelis Services avers that had the Air Force awarded the Thule Contract to Copenhagen Arctic, those employees "[would] become employees of [***]." *Id.*

4.  *Danish reaction.*

In response to the award of the Thule Contract to a foreign subsidiary, the Danish government expressed "concerns relating to the interpretation of international agreements between the two governments pertaining to the definition of a Danish/Greenlandic enterprise." Def.'s Opp'n to Pls.' Mots. for Prelim. Inj. App. at 50; *see also* Liisberg Decl. ¶ 48.  Given the diplomatic tension created by the award to Exelis Services, the United States government recently negotiated a framework with the Danish government, reflected in the Joint Statement issued in March 2015:

> The United States and the Kingdom of Denmark are endeavoring to address the concerns [regarding the award of the Thule Contract] as follows:
>
> • The United States and the Kingdom of Denmark have established an expert working group to develop a mutually acceptable definition of a Danish/Greenlandic enterprise.
>
> • *The U.S. Air Force intends to conduct a new acquisition and issue a new request for proposals for the Thule Air Base Maintenance Contract* once there is agreement between the United States and the Kingdom of Denmark regarding what constitutes a Danish/Greenlandic enterprise.
>
> • The U.S. Air Force intends then to competitively award a Thule Air Base Maintenance Contract.  The United States and the Kingdom of Denmark will determine to what degree, if any, competition will be limited.

Def.'s Opp'n to Pls.' Mots. for Prelim. Inj. App. at 50 (emphasis added).  The contemplation of a re-competition in the procurement provides salient evidence that the Air Force committed a fundamental error in awarding the Thule Contract to Exelis Services.  The government nonetheless emphasizes that "this [J]oint [S]tatement is not corrective action and does not render these cases moot."  Def.'s Opp'n to Pls.' Mots. for Prelim. Inj. at 58 n.24.

D.  *Protests at GAO*

In November 2014, Per Aarsleff, Copenhagen Arctic, and Greenland Contractors filed separate protests at GAO challenging the award to Exelis Services.[24]  Although these protests

---

[24]In accord with the Competition in Contracting Act ("CICA"), the Air Force suspended Exelis Services' performance while the protests were pending at GAO.  *See* FAR § 33.104(c)(1) ("When the agency receives notice of a protest from the GAO within 10 days after contract award or within 5 days after a debriefing date offered to the protester for any debriefing that is required by 15.505 or 15.506, whichever is later, the contracting officer shall immediately

were not consolidated by GAO, on February 18, 2015, GAO issued one decision addressing all three protests.  *See* AR 37-2726 (GAO Decision); *Per Aarsleff*, 2015 WL 1004252 (same).[25]  The primary ground considered by GAO in the protests was whether the contract to Exelis Services "was unreasonable and did not meet the RFP requirements because the awardee is not a Danish or Greenlandic company, but is rather a subsidiary of a foreign (United States) company."  *Per Aarsleff*, 2015 WL 1004252, at *5.  All three protestors argued that Exelis Services was incorporated in Denmark only shortly before proposal submissions and is a wholly-owned subsidiary of Vectrus, a foreign company based in the United States.  *See id.*, at *6.  Based on the "the treaty obligations between the United States and the Kingdom of Denmark," the protestors contended that "the awardee [was required] to be a Danish or Greenlandic firm, and that the Air Force was therefore required to look beyond the issue of 'registration' and to investigate the actual ownership of each offeror."  *Id.*, at *7.

GAO disagreed, holding that "the Air Force reasonably evaluated Exelis Services' proposal, and reasonably found that Exelis Services was eligible for award under the terms of the solicitation."  2015 WL 1004252, at *9.  GAO explained that the issue turned wholly on *registration* as a subsidiary, not whether the awardee actually was owned by a foreign, not Danish, parent:

> . . . [T]he RFP was clear on its face as to the issue of registration in the CVR.  Specifically, we agree with the Air Force and Exelis Services *that the RFP's eligibility analysis addressed whether the offeror was registered as a subsidiary of a foreign company.*  Apart from the RFP's language concerning registration, there are no other criteria in the RFP that explain how the agency would evaluate whether a firm was a Danish or Greenlandic enterprise.  Although the parties seek to add the issue of ownership or control to the RFP, nothing in the solicitation provides for consideration of these criteria.

*Id.*, at *8 (emphasis added).  Even if the language in the Solicitation created doubt as to how the agency was planning to interpret the registration requirement, GAO concluded that any doubt was clarified by the Air Force's Q&A regarding the meaning of that criterion.  *See id.* ("[The agency's] response clearly advised offerors that the Air Force believed that there was within the CVR a place for a firm to indicate that a firm was a subsidiary of a foreign firm.").  Furthermore,

---

suspend performance or terminate the awarded contract . . . ."); *see also* AR 20c-672 (issuing a stop work order to Exelis Services on November 13, 2014).

[25]GAO did not consolidate the bid protests, which meant that the administrative records provided in the respective proceedings were different.  *See supra*, at 3 n.3.  Due to protective orders issued in the protests, only a two-page summary of the decision was initially released to the public.  *See* AR 37-2724 to 2725 (GAO Press Release (Feb. 18, 2015)).  A redacted version of the decision was later made available.  *See Per Aarsleff A/S*, 2015 WL 1004252; *see also* AR 37-2722 (E-mail from Katherine Riback to Parties (Feb. 18, 2015)).

GAO found that to the extent there was any ambiguity in the language of the Solicitation, it was patent and the protests were therefore untimely.  *See id.*, at *9 ("Where a patent ambiguity in a solicitation is not challenged prior to the submission of bids, we will dismiss as untimely any subsequent challenge to the meaning of the solicitation term.") (citing 4 C.F.R. § 21.2(a)(1) ("Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals . . . .")).

    GAO also rejected several other protest grounds asserted by the parties, including a challenge by Greenland Contractors regarding the Air Force's price evaluation.  *See* 2015 WL 1004252, at *13.  Greenland Contractors had argued "that the Air Force failed to evaluate whether Exelis Services' proposed price was too low, and also argue[d] that the awardee's low price demonstrates that the awardee will not comply with Danish and Greenlandic labor law, as required by the RFP."  *Id.*  GAO found no merit in this argument because it "conclude[d] that the solicitation did not require the Air Force to conduct a price realism evaluation."  *Id.*, at *14.  Although the price evaluation required offerors to "show justification for unique practices that significantly lower pricing," AR 88-5265, GAO "[did] not think that this statement obligated the agency to evaluate the risk of poor performance stemming from a low price, in light of the absence of a price realism factor in the solicitation," 2015 WL 1004252, at *14.

    Following the decision by GAO, the stay under CICA was lifted, and Exelis Services resumed its phase-in activities pursuant to the Thule Contract.  *See* Prelim. Inj. Hr'g Tr. 100:10-21, 103:1 to 107:6.

### E.  *Protests in this Court*

    Per Aarsleff, Greenland Contractors, and Copenhagen Arctic filed separate suits in this court challenging the Air Force's award of the Thule Contract to Exelis Services.  *See* Per Aarsleff's Compl. in No. 15-215C ¶ 8; Greenland Contractors' Compl. in No. 15-272 ¶ 8; Copenhagen Arctic's Compl. in No. 15-330 ¶ 1.  Per Aarsleff filed the first complaint on March 3, 2015, and the next day the court granted a motion by Exelis Services to intervene.  Order of Mar. 4, 2015, ECF No. 12.  The court set an accelerated briefing schedule to culminate in a hearing scheduled for mid-May.  *See* Scheduling Order of Mar. 4, 2015, ECF No. 13 (No. 15-215).  Per Aarsleff subsequently filed a motion for preliminary injunction on March 11, 2015, *see* Per Aarsleff's Mot. for Prelim. Inj., ECF No. 23,[26] and Greenland Contractors followed with its complaint and a motion for preliminary injunction on March 17, 2015, *see* Greenland Contractors' Motion for Prelim. Inj., ECF No. 6 (No. 15-272).  The cases were consolidated, *see* Order of Mar. 20, 2015, ECF No. 19, and the court set a date for a hearing on the motions for a preliminary injunction, *see* Amended Scheduling Order of Mar. 20, 2015, ECF No. 34.  Shortly

---

[26]Per Aarsleff did not initially request a preliminary injunction because "[it] was hopeful that the [government] would agree to a voluntary stay of performance of Exelis Services' contract."  Per Aarsleff's Mot. for Prelim. Inj. at 2.  When it did not receive any indication that the government would agree to a voluntary stay, Per Aarsleff filed a motion for preliminary injunction "to preserve the status quo" during the pendency of the litigation.  *Id.*

thereafter, on March 31, 2015, Copenhagen Arctic filed its complaint.  The hearing on Per Aarsleff's and Greenland Contractors' motions for a preliminary injunction was held on April 2, 2015, and the court then consolidated the case in *Copenhagen Arctic* with the other recently consolidated cases.  On April 29, 2015, the court ordered that the disposition of the motions for preliminary injunction be consolidated with the merits pursuant to RCFC 65(a)(2).  *See* Order of Apr. 29, 2015, ECF No. 64.[27]  Consolidation was appropriate because (1) the court had previously set an accelerated briefing and argument schedule; (2) the government had produced a more thorough record than that available during the hearing on the motions for preliminary injunction and in the three separate proceedings at GAO; and (3) the government had advised the court that a short hiatus in acting on plaintiffs' requests for injunctive or declaratory remedies would not materially affect the government's posture in the procurement itself.  *See* Order of Apr. 29, 2015.

Briefing on the motions for judgment on the administrative record has proceeded on an accelerated basis.  The administrative record was submitted and supplemented twice,[28] cross-motions for judgment on the administrative record were received, briefing was completed on May 19, 2015, and a hearing on the merits was held on May 22, 2015.  Given the importance of the contract at issue, the expedited schedule has allowed the court to reach a resolution of this bid protest very promptly.

## JURISDICTION

### A. *28 U.S.C. §1491(b)(1)*

As an initial matter, this court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)).  In relevant part, the Tucker Act as amended vests this court with the juridical power to

---

[27]RCFC 65(a)(2) provides:

> Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing.  Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial.

RCFC 65(a)(2).

[28]In this tripartite bid protest, the government has produced a more expansive administrative record than that made available to GAO.  The record here includes, among other things, communications between the Air Force and the offerors that are relevant to this procurement and were not available in conjunction with the proceedings that previously occurred at GAO.  *See, e.g.*, AR 271-2875 (Danbor Q&A); *see also* Def.'s Notice of Filing Amendment to Admin. Record, ECF No. 59.

render judgment on an action by an *interested party* objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (emphasis added); *see also Systems Application & Techs., Inc v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012) ("On its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement.").

### B. *The "Treaty Bar"*

The government challenges this court's subject matter jurisdiction, arguing that 28 U.S.C. § 1502 bars the court's exercise of jurisdiction.  28 U.S.C. § 1502 is applicable to claims based on treaties and provides:

> Except as otherwise provided by Act of Congress, the United States Court of Federal Claims *shall not have jurisdiction of any claim* against the United States *growing out of* or dependent upon *any treaty* entered into with foreign nations.

28 U.S.C. § 1502 (emphasis added).  "In enacting the predecessor of Section 1502, Congress seems to have been concerned to prevent United States citizens from suing directly in the Court of Claims to collect monies paid by foreign governments to the United States, under a treaty, in discharge of a class of individual claims."  *S. N. T. Fratelli Gondrand v. United States*, 166 Ct. Cl. 473, 478 n.3 (1964) (citing *Great Western Ins. Co.* v. *United States*, 112 U.S. 193, 199-200 (1884)).  According to its terms, this jurisdictional prohibition applies to a claim that is "dependent upon and grows out of [a] treaty."  *United States v. Weld*, 127 U.S. 51, 57 (1888) (per Lamar, J.) (internal quotation marks omitted).  In other words, "the right itself, which the petition makes to be the foundation of the claim, must have its origin—derive its life and existence—from some treaty stipulation."  *Id.*

The Court of Claims has interpreted the term "treaty" to include "international executive agreements," *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 903 n.17 (Ct. Cl. 1976), and that interpretation is binding upon this court.[29]  "The reason for this [interpretation] is that the

---

[29]The United States Constitution makes a distinction between "Treaties" and nontreaty "Agreement[s]" or "Compact[s]."  *Compare* U.S. Const. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."), *with id*. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress . . .  enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.").  Based on the work of eighteenth-century writer Emmerich de Vattel, *see* Emmerich de Vattel, *The Law of Nations* (London, printed for J. Newberry *et al*. 1760), there is evidence that "the Founders may have understood 'Treaties' to encompass 'treaties of peace, of

fundamental separation-of-powers policy underlying [§] 1502, i.e., to avoid undue judicial interference (e.g., by construction of particular treaty terms and provisions) with the Executive Branch's conduct of foreign relations, is equally applicable to both forms of international compact." *Id.*

The government contends that because plaintiffs' allegations are dependent on an international executive agreement, *i.e.*, the 1951 Defense of Greenland Agreement and the 1991 MOU (as amended by the 2009 Diplomatic Note), this court is divested of jurisdiction under 28 U.S.C. § 1502.  *See* Def.'s Cross-Mot. for Judgment on the Admin. Record and Responses to Pls.' Mots. for Judgment on the Admin. Record ("Def.'s Cross-Mot.") at 37-39, ECF No. 66; *see also* Def.'s Reply to Pls.' Opp'ns to Def.'s Cross-Mots. for Judgment on the Admin. Record ("Def.'s Reply") at 10, ECF No. 74.  In the government's view, plaintiffs have "explicitly request[ed] that the [c]ourt construe the term 'Danish/Greenlandic sources' in the amendment to the 1991 MOU to exclude subsidiaries of foreign companies." *Id.* at 38.  Accordingly, the government contends that judicial interpretation of this international agreement "could affect the current negotiations between the United States and Denmark. . . [, which] is exactly what Section 1502 is designed to avoid." *Id.*

Assuming that the amendment to the 1991 MOU forms an "international executive agreement" or "treaty," it is nonetheless appropriate to hear plaintiffs' claims in these bid protests because these claims neither directly nor proximately stem from an international agreement.  *See Weld*, 127 U.S. at 57 ("[T]he statute contemplates a direct and proximate connection between the treaty and the claim.").  Contrary to the government's argument, the court exercises its juridical power to construe the provisions in the Solicitation that were explicitly drafted to satisfy and incorporate the international understanding.  In this endeavor, the court will look to the underlying agreements as a guide to interpreting the text of the Solicitation.  *See Dalles Irrigation Dist. v. United States*, 71 Fed. Cl. 344, 354 n.11 (2006) ("Because this is a situation where the contract was entered to satisfy a statutory requirement . . .  the interpretation of the contract must be guided by an examination of the underlying statute."); *see also Roedler v. Department of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) ("For determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose.") (citing *Rendleman v. Bowen*, 860 F.2d 1537, 1541-42 (9th Cir. 1988); *American Hosp. Ass'n. v. Schweiker*, 721 F.2d 170, 183 (7th Cir. 1983); *Busby School of Northern Cheyenne Tribe v. United States*, 8 Cl. Ct. 596, 602 (1985)).  The court will not, however, be directly enforcing the terms of the bilateral agreement between the United States and Denmark.  *See Hughes Aircraft*, 534 F.2d at 906 ("[W]e find plaintiff's claim no more directly or proximately intertwined with the 1970 MOU than was the escrow agreement with the Byrnes-Blum treaty in *Societe Anonyme*, the Court of Commissioners

---

amity and commerce, consular conventions, [and] treaties of navigation.'  At the same time, they may have understood nontreaty [A]greements and [C]ompacts to encompass matters such as 'settlements of boundary lines with attending cession or exchange of strips of land,'" Bradford R. Clark, *Domesticating Sole Executive Agreements*, 93 Va. L. Rev. 1573, 1593 (2007) (citations omitted).  Professor Clark observed that "time has obscured this distinction" and "there appears to be no real consensus among today's courts and commentators as to how to draw a clear line between 'Treaties' and nontreaty '[A]greements.'"  *Id.* at 1592, 1594.

Act with the Alabama Claims Treaty in *Weld*, or the taking claim with the Italian Peace Treaty in *Fratelli*.  Accordingly, we conclude that § 1502 presents no bar to our exercise of jurisdiction in this case.") (emphasis added) (referring to *Weld*, 127 U.S. at 57; *S. N. T. Fratelli Gondrand*, 166 Ct. Cl. at 478; and *Societe Anonyme Des Ateliers Brillie Freres v. United States*, 160 Ct. Cl. 192, 196-99 (1963)).

This court therefore has the juridical power to hear plaintiffs' claims, which neither seek relief based upon a treaty nor the enforcement of a treaty provision subject to 28 U.S.C. § 1502.

## C. *Standing*

Only an "interested party" has standing to challenge the award of a contract in a bid protest.  *See* 28 U.S.C. § 1491(b)(1).   "An interested party is an actual or prospective bidder whose *direct economic interest would be affected by the award* of the contract."  *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (internal citation omitted) (emphasis added).  A "direct economic interest" is shown by demonstrating that the disappointed bidder had a "substantial chance" of winning the award.  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) (internal citations omitted); *see also ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 107 (2013) ("'[A] bidder has standing to challenge the lawfulness of discretionary acts that operate to exclude the bidder from consideration in cases where the bidder's ratings are such that had the government acted lawfully the bidder would have had a substantial chance of winning the contract.'") (quoting *G4S Tech. CW LLC v. United States*, 109 Fed. Cl. 708, 719 (2013)).

Exelis Services argues that Greenland Contractors, as the highest-priced offeror in the procurement, lacks standing to pursue this protest.  Exelis Services' Cross-Mot. at 56-57.  Exelis Services contends that "Greenland Contractors cannot establish standing with respect to the eligibility of Exelis Services, unless and until it has established that: (1) the Agency's price evaluation was flawed[;] and (2) it was prejudiced by that flawed evaluation," *id.* at 57, and even then, "Copenhagen Arctic would be next in line," *id.* at 25 n.10.  Further, Exelis Services avers that Greenland Contractors "cannot establish the requisite prejudice, which defeats its ability to succeed on the merits."  *Id.* at 25.[30]

These arguments are not persuasive.  Greenland Contractors has plausibly alleged that the Air Force committed errors by failing to adhere to various criteria set forth in the RFP and by engaging in misleading discussions regarding pricing.  *See* Greenland Contractors' Mot. at 5-6 ("[A]bsent the Air Force's eligibility and technical acceptability errors, Greenland Contractors would have been the only technically acceptable offeror.  Moreover, the Air Force's flawed pricing evaluation left Greenland Contractors' unreasonably high prices uncorrected and allowed the three lower-priced offerors to propose unjustified lower pricing.").  Contrary to Exelis Services' position, if the court finds Greenland Contractors' protest grounds to be persuasive, it

---

[30]The government has not disputed that Greenland Contractors has standing to pursue its protest.  It does, however, contend that "Copenhagen Arctic and Greenland Contractors have not demonstrated that [the mistakes in the Solicitation] were prejudicial."  Def.'s Cross-Mot. at 35.

would have a substantial chance to receive the award because the offers submitted by the other bidders would have been found to be flawed. *See Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014) (holding that the fourth-lowest bidder in a LPTA procurement had been sufficiently prejudiced to satisfy the requirement of standing, in a circumstance where the three lower offerors each failed to comply with applicable limitations on subcontracting). Exelis Services' arguments to the contrary concern the merits of Greenland Contractors' contentions, and are addressed *infra*.

In sum, Greenland Contractors has standing to pursue this protest.[31]

### STANDARDS FOR DECISION

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs the court's review of challenges to an agency's contract award. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, a court may set aside an agency decision if the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), where the criteria for equitable relief are satisfied, *see Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA*, 389 F.3d at 1228-29). While the court's review of agency action is deferential, *see Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000), that review must also be "searching and careful," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent that it recognized the APA as an independent grant of subject matter jurisdiction). When an agency action is challenged, the court "must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal citation and quotation marks omitted); *see also Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009). The court may not, however, "'substitute its judgment for that of the agency.'" *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 416).

Under these standards, the court may set aside a procurement decision where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). An agency's determination lacks a rational basis if the contracting officer "'failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the result] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Keeton Corrs.*, 59 Fed. Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n v.*

---

[31]As interested parties, Per Aarsleff and Copenhagen Arctic also have standing to challenge the award. *See* Per Aarsleff's Mot. at 32-34; *see also* Copenhagen Arctic's Mot. at 20. But for the impact of the Air Force's decisions which are alleged to be arbitrary or unlawful, both parties would have had a "substantial chance" of being the awardee. *See Rex Serv. Corp.*, 448 F.3d at 1308.

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "[T]he disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Centech Grp.*, 554 F.3d at 1037 (internal citations and quotation marks omitted).  In challenging an agency action on the second ground, the disappointed bidder must establish "'a clear and prejudicial violation of applicable statutes or regulations.'"  *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

## ANALYSIS

### A.  *Eligibility*

1.  *The terms of the Solicitation.*

As previously emphasized, the Solicitation specified that "[p]articipation in this acquisition is limited to Danish/Greenlandic enterprises."  AR 88-5252.  The primary dispute in this litigation turns on what was meant by Danish-Greenlandic enterprises and specifically on the meaning and interpretation of the phrase, "THE ENTERPRISE . . . SHALL NOT BE REGISTERED AS A SUBSIDIARY OF [A] FOREIGN COMPANY," found in Sections L-3 and L-6 of the Solicitation.  *See* AR 88-5252, 5259 (emphasis in original).  This restrictive phrase focuses on an enterprise organized as a company rather than under a different economic and organizational structure, *e.g.*, as a partnership, sole proprietorship, association, joint venture, or cooperative.  That focus is perhaps understandable from a practical perspective, because the procuring authority would expect that the corporate form would be employed by enterprises large enough to compete for a contract as substantial as the one at hand.  In all events, Danish corporate law is at issue.

The government insists that the eligibility restriction concerned the issue of registration and that its intent was to ensure that offerors were fully "registered as Danish" by excluding entities specifically "*registered as*" a subsidiary of a foreign company.  *See* Def.'s Cross-Mot. at 17-26; *see also* Exelis Services' Cross-Mot. at 31-34.  The plaintiffs disagree, arguing that the restrictive language of Section L should be interpreted as being about foreign ownership rather than registration.  *See, e.g.*, Per Aarsleff's Mot. at 11-17.  Under plaintiffs' interpretation, any *subsidiary of a foreign company* would not qualify as an eligible Danish or Greenlandic enterprise under the RFP.  *See, e.g.*, Greenland Contractors' Mot. at 8-11.

Pursuant to the canons of contract interpretation, this court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004); *see also Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996) ("We read the language of a particular contractual provision in the context of the entire agreement . . . and construe the contract so as not to render portions of it meaningless . . .") (citing *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)).  "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); *see also Fortec*

*Constructors*, 760 F.2d at 1292 ("This court must be guided by the well accepted and basic principle that an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.") (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)); *Restatement (Second) of Contracts* § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

The government's construction violates these fundamental tenets of contract interpretation. Because it was not possible to register a company in Denmark as a subsidiary of a foreign company during the time of the procurement, the government's interpretation eviscerates any significant meaning from the eligibility criterion and renders the restriction illusory. *Cf. United States v. Seckinger*, 397 U.S. 203, 213-14 (1970) ("The view adopted by the Court of Appeals . . . would drain this clause [of the contract] of any significant meaning."). As the government and Exelis Services would have it, foreign entities could create Danish subsidiaries prior to submission of a proposal and then qualify for an award. Under their interpretation, the restriction set forth in Section L-3 that limited participation to "Danish/Greenlandic enterprises" could easily be circumvented and converted into a formalistic non-substantive criterion that would not serve to fulfill the executive agreements between the United States and Denmark regarding Greenland. *See* AR 88-5252 to 5253. The government maintains its interpretation even though early in this litigation it "acknowledge[d] that the Air Force's explanation in the December 2013 question and answer was incorrect and there is not, in fact, a way to register as a 'subsidiary of foreign company' in the CVR." Def.'s Opp'n to Pls.' Mots. for a Prelim. Inj. at 29; *see also* Def.'s Cross-Mot. at 29 ("[T]here is not, in fact, a way to register as a 'subsidiary of [a] foreign company.'"). The court will not sanction such an unreasonable outcome. *See Perry & Wallis, Inc. v. United States*, 427 F.2d 722, 726 (Ct. Cl. 1970) ("[I]f plaintiff's interpretation of the contract is followed literally, it could lead to extremely unreasonable results. . . .   Any interpretation of the contract that would sanction such a result would be patently unreasonable.").

Some recasting of the language in the Solicitation is necessary due to the defect in the eligibility criteria stated in Sections L-3 and L-6. In that respect, the court strongly prefers to excise the mistaken words, preserving the remainder of the text and comporting with the evident intent of the procuring agency to implement the pertinent bilateral agreements. *Cf. Hibbs v. Winn*, 542 U.S. 88, 89 (2004) (discussing the cardinal rule against superfluities); *see also NVT Techs.*, 370 F.3d at 1159. Exelis Services provides a list of hypothetical circumstances in which a Danish entity would or would not be eligible for award under plaintiffs' interpretation. *See* Exelis Services' Cross-Mot. at 35-36. For example, "a registered Danish company (A/S) which is owned in its entirety by an individual citizen of any foreign country" would be eligible for award, but "[a] registered Danish company (A/S) whose parent is a corporation of a European Union Member" would be ineligible. *Id.*; *see also* Def.'s Cross-Mot. at 20-21. Any "short-coming" along these lines is not germane to this bid protest; the underlying executive agreements focus on Danish and Greenlandic sources, not those of the European Union generally. The government also argues that "read[ing] the words 'registered as' completely out of the provision . . . [v]iolates the 'cardinal principle of construction of contracts that . . . every word in [a contract], will, if possible, be given effect.'" Def.'s Cross-Mot. at 20 (citing *AMP Inc. v. United States*, 389 F.2d 448, 454 (Ct. Cl. 1968)). In making this argument, the government ignores the

28

fact that it was never possible to register as a foreign subsidiary and that its interpretation over-looks the remaining words of the disputed provision, thus disavowing the same legal axiom upon which it relies.[32]

Finally, the government's interpretation of the eligibility restriction contradicts long-standing agreements and other communications between the United States and Denmark, which explicate the intent and meaning of the eligibility restriction. *Cf. Ralden P'ship v. United States*, 891 F.2d 1575, 1577 (Fed. Cir. 1989) ("The primary objective of contract interpretation is to ascertain the intent of the parties at the time they entered into the contract."). Plaintiffs correctly state that the purpose of the restriction was "to ensure Greenland and Greenlandic society [the] greatest possible benefits from the agreement." *See* AR 20g-874. This purpose has also been confirmed by the government of Denmark. *See* Liisberg Decl. ¶ 48 ("[T]he object and purpose of the . . . eligibility criteria . . . was to ensure Greenland and Greenlandic society greatest possible benefits from the agreement, and the intention was to maintain the spirit of the agreements underlying the recent procurement procedure.") (quotation marks omitted). According to Ambassador Liisberg, the eligibility criteria in the Solicitation were intended to ensure that offerors "not only have a formal link by registration to Denmark or Greenland, but a real and genuine link, *avoiding shell companies owned and controlled by foreign companies*." *Id.* (emphasis added). The Air Force's actions during the evaluation process reinforce the interpretation now being offered by Ambassador Liisberg. The Air Force first informed offerors during the RFP Q&A period that it was possible "to see if the company is fully registered as Danish *or acting as a foreign subsidiary in Denmark*." *See* AR 20e-826 (RFP Q&A) (emphasis added). It also did not affirmatively agree with Danbor's premise that a "foreign company" would be eligible for award if "registered as a [Danish company]." AR 271-28735 (Danbor Q&A). Later, the Air Force asked the Danish Ministry of Finance to confirm whether offerors could be "considered Danish [f]irms and *not a subsidiary of a foreign firm*." AR 20g-879 (emphasis added).[33] Lastly, a contract specialist in the Air Force asked the Danish Business

---

[32]Perhaps recognizing that its interpretation of the Solicitation is undermined by the recent Joint Statement of the Danish and United States governments, the government argues that the Joint Statement "may not be considered for purposes of the merits because it is not part of the administrative record, nor has the [c]ourt granted a motion to supplement the administrative record with this *post hoc* document." Def.'s Cross-Mot. at 25. Although the Joint Statement might not be "corrective action," *see* Def.'s Opp'n to Mots. for Prelim. Inj. at 58 n.24, it does indicate that the Air Force's action in the procurement was erroneous. As such, the court may take it into account. *See Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 494 (2006), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007) (reciting that courts have considered such materials "*in cases where evidence arising after the agency actions shows whether the decision was correct or not*") (emphasis added).

[33]In the proceedings before GAO, the contracting officer submitted a statement of facts that distorted the question, stating that "[o]n July 30, 2014[,] an e[-]mail was sent to the [Danish Ministry of Finance] requesting assistance in confirming whether all Offerors were considered Danish firms and *not registered* as subsidiaries of a foreign company." AR 20c-681 (emphasis added). The actual question posed did not ask about registration, but whether the offerors could

Authority if it could "help by confirming that [the offerors] . . . [were] *not subsidiaries of foreign companies*." AR 20g-881 (emphasis added); *see also* AR 20g-879. These communications confirm that the Air Force was concerned with the issue of foreign ownership and intended to exclude foreign subsidiaries from eligibility.[34] Yet, the effect of adopting the government's proffered construction would be to read the foreign ownership restriction out of the Solicitation altogether. Such a reading would be impermissible. *See Roschen v. Ward*, 279 U.S. 337, 339 (1929) (Holmes, J.) ("[T]here is no canon against using common sense in construing laws as saying what they obviously mean."); *cf. United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386 (1805) (Marshall, C.J.) ("Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived.") (looking to the title of an act as an aid to construction).

   Exelis Services diverges from the government's interpretative contentions and argues that the intent of the eligibility criterion was to preclude offerors registered as a *branch* of a foreign company. *See* Exelis Services' Cross-Mot. at 13-21; *see also* Def.-Intervenor Exelis Services A/S's Reply in Support of its Cross-Mot. for Judgment on the Admin. Record and Opp'n and Response to Pls.' Replies to the Def.'s and Def.-Intervenor's Cross-Mots. for Judgment on the Admin. Record ("Exelis Services' Reply") at 12-18, ECF No. 75. Exelis Services avers that "the record is clear that the crux of the eligibility criteria was, and always has been, premised on *registration*." Exelis Services' Cross-Mot. at 13 (emphasis in original). Exelis Services deals with the mistake in translation by averring that the Solicitation containing the phrase "not registered as *subsidiary* of [a] foreign company," AR 88-5252 to 5253, 5257 (emphasis added), erroneously referred to "subsidiary" instead of a "branch" of a foreign company. Exelis Services' Cross-Mot. at 20. Because Exelis Services is a registered Danish company, *i.e.*, an A/S, and not a branch of a foreign company, it contends that "the outcome simply would not have been different if the mistake [in translation] had not occurred." *Id.*

   While creative, this argument is untethered to the administrative record before the court. *See* Combined Reply of Greenland Contractors I/S in Support of Its Mot. For Judgment on the Admin. Record and in Opp'n to Def.'s and Intervenor's Cross-Mots. ("Greenland Contractors' Reply") at 6 n.3, ECF No. 69. First, Exelis Services' argument contradicts the position of the Air Force during the protests before GAO. *See* Copenhagen Arctic's Reply at 3. There, the Air Force was asked in a set of interrogatories to "respond to the point raised by the protester that the agency used 'branches' and 'subsidiaries' as if they were synonyms." AR 256-28560 (Agency's Answers to Interrogatories). The Air Force responded that "[it] reasonably used the

---

be considered "Danish firms and *not a subsidiary* of a foreign firm." AR 20g-879 (emphasis added).

   [34]The acquisition plan for the Thule Contract further shows that the Air Force was concerned about ownership of the offerors. The Air Force initially identified only six potential Danish or Greenlandic businesses. *See* AR 20zg-1507. It also characterized non-Danish or Greenlandic firms as those entities with less than 49 percent Danish or Greenlandic ownership. *See* AR 20zg-1501, 1521. Notably, "a 'subsidiary corporation' is defined as 'one in which another corporation owns at least a majority of the shares and thus has control.'" Copenhagen Arctic's Mot. at 13 (quoting *Black's Law Dictionary*, Fifth Edition, (1968)).

term 'subsidiary' as a result of its international legal obligations" and stated that "*[it] did not use the term 'subsidiary' by mistake.*" *Id.* (emphasis added).  Second, irrespective of whether Mr. [***] mistranslated "branch" for "subsidiary," *see* AR 20f-873, the United States Ambassador and the Danish Ministry of Finance negotiated the 2013 Diplomatic Note (written in English) to expressly include the word "subsidiary," *see* AR 20g-875.  Absent from the negotiated criteria in the 2013 Diplomatic Note were any references to a "branch."  *See* AR 20g-874 to 875.  Finally, the word "subsidiary" was also repeated several times by the contracting officer during the RFP Q&A, as well as by Air Force personnel during the evaluation.  *See supra*, at 9, 16.  Based on this evidence, the Solicitation prohibited foreign subsidiaries, not foreign branches.  Exelis Services' argument is not persuasive.

Mindful of the bilateral agreements and understandings between the United States and Danish government and in light of the foregoing, the only reasonable interpretation of the phrase, "SHALL NOT BE REGISTERED AS A SUBSIDIARY OF [A] FOREIGN COMPANY," is that Danish subsidiaries of foreign entities did not qualify as eligible "Danish/Greenlandic enterprises."  *See* AR 88-5252 to 5253, 5257 (emphasis in original).  Company registration was used mistakenly as a means to ensure genuine Danish or Greenlandic ownership and control.  Given that some recasting must be done to take account of this fault, the court's reading accords a reasonable meaning to all parts of Sections L-3 and L-6, except for the mistaken words "registered as."  *See Banknote Corp. of Am.*, 365 F.3d at 1353; *see also Fortec Constructors*, 760 F.2d at 1292.

### 2.  *Defect and waiver.*

Relying on *Blue & Gold Fleet*, 492 F.3d 1308, the government argues that plaintiffs should have realized there was a patent defect in the eligibility criterion and that their failure to raise the issue before the close of the bidding process constitutes a waiver barring their reliance on the defect as the basis for a protest in this court.  *See* Def.'s Cross-Mot. at 26-34; *see also* Exelis Services' Cross-Mot. at 40-49.  Plaintiffs resist this contention by arguing that the mistake concerning registration constituted a latent error that should be construed against the Air Force, *i.e.*, the drafter of the Solicitation.  *See* Per Aarsleff's Mot. at 18-23; *see also* Greenland Contractors' Mot. at 16-17; Copenhagen Arctic's Mot. at 16-18.  The court accordingly must address whether the defect in the Solicitation was latent or patent.  *See E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1342 (Fed. Cir. 2004) ("Just as a contractor may recover for a latent ambiguity, a contractor may recover for a latent defect; just as a contractor may not recover for a patent ambiguity, a contractor may not recover for a patent defect.").[35]

The doctrine of *contra proferentem* "puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy[,] . . . and it saves contractors from hidden traps not of their own making." *Metcalf Const. Co. v.*

---

[35]The language in the Solicitation was not ambiguous but rather was defective.  "Nevertheless, there are similarities in the law," *E.L. Hamm & Assocs.*, 379 F.3d at 1342, and the court will treat the government and Exelis Services as arguing in favor of finding a patent defect and plaintiffs as arguing for a latent defect.

*United States*, 53 Fed. Cl. 617, 629 (2002) (alteration in original) (citing *Sturm v. United States*, 190 Ct. Cl. 691, 697 (1970)).  However, an exception to the rule of *contra proferentem* exists when the defect in the solicitation is found to be patent, rather than latent.  *See Blue & Gold Fleet*, 492 F.3d at 1313 (citing *E.L. Hamm & Assocs.*, 379 F.3d at 1342).  In *Blue & Gold Fleet*, the Federal Circuit held that a plaintiff that "has the opportunity to object to the terms of a government solicitation containing a *patent error* and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  492 F.3d at 1313 (emphasis added).  The court explained,

> We have applied the doctrine of patent ambiguity in cases where, as here, a disappointed bidder challenges the terms of a solicitation after the selection of another contractor.  *See Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000); *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996).  Under the doctrine, where a government solicitation contains a patent ambiguity, the government contractor has 'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation' in a subsequent action against the government.  *Stratos*, 213 F.3d at 1381 (quoting *Statistica*, 102 F.3d at 1582).

*Id.*[36]

A defect is patent "when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."  *Stratos Mobile Networks*, 213 F.3d at 1381.  Conversely, a defect is latent when it is hidden or concealed and not apparent on the face of the document.  *See J.C.N. Const., Inc. v. United States*, 107 Fed. Cl. 503, 512 (2012) (distinguishing between "subtle inconsistencies [that] do not put a reasonable contractor on notice" and "obvious, gross, [or] glaring" inconsistencies that are patent) (alteration in original) (quoting *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996) (in turn quoting *H & M Moving, Inc. v. United States*, 499 F.2d 660, 671 (Ct. Cl. 1974))); *see also Mountain Home Contractors v. United States*, 425 F.2d 1260, 1264 (Ct. Cl. 1970) ("The government cannot make a contractor the insurer of all government mistakes.  The duties imposed on a contractor were succinctly stated in *Blount Bros. Constr. Co. v. United States*, . . . 346 F.2d 962, 973 ([Ct. Cl.] 1965): '. . .

---

[36]The court in *Blue & Gold Fleet* stated that the waiver rule furthers the statutory mandate that "the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."  492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)(3)).  Recently, the Federal Circuit has reiterated that the "waiver rule implements this statutory mandate by reducing the need for the 'inefficient and costly' process of agency rebidding 'after offerors and the agency ha[ve] expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation.'"  *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) (citing *Blue & Gold Fleet*, 492 F.3d at 1314) (alteration in original).

[T]hey are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents . . . . ’”).

Here, the mistaken "registered as" language in Sections L-3 and L-6 of the Solicitation appeared to be correct but was in fact defective.  Nothing about the text appeared to be implausible or contradicted other portions of the Solicitation.  Before the Solicitation was issued, neither the Air Force nor the State Department, nor indeed the Danish Ministry of Foreign Affairs, understood that it was impossible to register as a foreign-owned subsidiary in the CVR.  Potential offerors asked for clarification but received incorrect or erroneous answers, reflecting the Air Force's mistaken belief at the pertinent time.  During procurement, the Air Force repeatedly assured offerors that it was possible to register as a foreign subsidiary.  *See supra*, at 9-10.  Only later, in August 2014 (three months before award), did the Air Force discover the error, *see* AR 20g-883, but it chose to continue with the procurement without correcting the mistake or notifying the offerors of the inaccuracy.[37]  In these circumstances, the underlying error was not patent.  The impossibility of registering as a foreign subsidiary cannot be said to be "obvious, gross, [or] glaring," *H & M Moving*, 499 F.2d at 671, when the Air Force specifically confirmed this possibility to offerors, *cf. Grumman Data Sys.*, 88 F.3d at 998 (finding an ambiguity patent when the "agency's answer [was] susceptible to more than one meaning on its face").

The question also arises whether there was reason during the procurement for offerors to investigate the veracity of the language in the Solicitation and the accuracy of the answers provided by the Air Force.  *See* Def.'s Reply at 7-9.  *Compare NVT Techs.*, 370 F.3d at 1162 (Where "a certain set of line items [were] expressed in a manner so different from hundreds of other line items, yielding totals disproportionate to the remainder of the solicitation," it "should have raised a red flag for [the offeror], requiring [the offeror] to inquire"), *with E.L. Hamm & Assocs.*, 379 F.3d at 1343 ("Without any reason to reverse engineer the daily mowing and policing acreages or, conversely, to calculate a minimum yearly total for policing using the single mowing acreage, [petitioner] had no reason to discern the error [in the solicitation]."). To

---

[37]The government insists that the contracting officer did not realize that it was impossible to register as a foreign subsidiary until *after* the award decision.  *See* Def.'s Cross-Mot. at 33-34.  To support this position, the government cites to evidence involving a post-award debriefing session dated November 6, 2014, in which "the contracting officer told both [Per] Aarsleff and Copenhagen Arctic that it was possible to register as a 'subsidiary of a foreign company.'"  *Id.* (citing AR 1-435 (Decl. of Kurt Carlsen (Nov. 10, 2014)); AR 223-23077 (Copenhagen Arctic's GAO Protest (Nov. 11, 2014))).  The government's argument is untenable.  The contracting officer asked for assistance directly from the Danish Business Authority, and in August 2014, was advised that the Authority "does [not] register owners, therefor[e] this [A]uthority cannot shed light [on] w[hether] or not the companies are subsidiaries of foreign companies."  AR 20g-883.  Moreover, the administrative record shows that the contracting officer received notice from Exelis Services that it was a "wholly-owned subsidiary of [Vectrus] Systems Corporation" as early as June 16, 2014.  AR 145-11033.  In light of this record evidence, the court finds it incredible that the contracting officer pre- or post-award was under the belief that it was possible to register as a foreign subsidiary.

discover the defect in the Solicitation in this case, the offerors would have had to assume that the Air Force's information was factually erroneous and then independently contact the Danish Business Authority to inquire whether it was possible to register as a foreign subsidiary. *See* Per Aarsleff's Mot. at 19. The defect was not "obvious on the face of the [S]olicitation." *NVT Techs.*, 370 F.3d at 1162. Even though plaintiffs are "Danish companies" and could have requested a formal opinion from Danish Business Authority, *see* Def.'s Cross-Mot. at 29, "*Blue & Gold [Fleet]* does not require offerors to second guess the plain language of a solicitation and inquire about the veracity or accuracy of every assertion set out in a solicitation," *J.C.N. Const.*, 107 Fed. Cl. at 512.

Accordingly, *Blue & Gold Fleet* is not applicable in this case, and having itself discovered the mistake during the evaluation process, the Air Force was responsible for correcting the error. *See Metropolitan Van & Storage, Inc. v. United States*, 92 Fed. Cl. 232, 267 (2010) ("[I]f [the agency] did not craft the solicitation as artfully as it should have, [the agency] will be responsible for the resulting impact on the procurement."). The government challenges this conclusion on the ground that FAR § 15.206 does not specifically state that agencies are responsible for correcting known defects in a solicitation before award. *See* Def.'s Cross-Mot. at 33. The cited provision of the FAR provides that "when, either before or after receipt of proposals, the [g]overnment changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." FAR § 15.206(a). The government's argument is peculiar and wrong. FAR § 15.206 deals with an agency's decision to amend a solicitation to change requirements, terms, or conditions. Drawing a negative inference from a failure to make an amendment is not permissible, and thus the provision cannot be read to exculpate an agency from being responsible for mistaken language it includes in a solicitation.

3. *Arbitrary and capricious nature of the agency's decision.*

"It is blackletter law that a procuring agency may only accept an offer that conforms to the material terms of the solicitation." *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 518 (2012); *see also E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.") (internal citations and quotation marks omitted). A provision in a solicitation is material "if failure to comply with it would have a non-negligible effect on the price, quantity, quality, or delivery of the supply or service being procured." *Furniture by Thurston*, 103 Fed. Cl. at 518 (citing *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 457 (2010) (in turn citing *Centech Grp.*, 554 F.3d at 1038)). As previously discussed, a material term in the RFP required the awardee to be a genuine Danish or Greenlandic enterprise, and to that effect, prohibited foreign subsidiaries from competition. The Air Force awarded the Thule Contract to a company that is incorporated as a Danish entity, but one that undeniably is a subsidiary of a United States (foreign) company. *See supra*, at 15, 18; *see also* Exelis Services' Cross-Mot. at 22 (acknowledging that "at the time of its registration, Exelis Services was a subsidiary of [Vectrus] Systems, an American corporation"). On these facts, the Air Force contravened federal procurement law when making an award based upon a proposal that failed to satisfy the material source restriction that limited competition to Danish or Greenlandic entities and not subsidiaries of foreign companies. Further, the government has neither "'provided a coherent and reasonable explanation of its exercise of discretion'" in making the award to a

Danish subsidiary of a non-Danish company, *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)), nor has it articulated a "'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

In short, the agency's decision to award Exelis Services the Thule Contract was arbitrary and capricious and not in accord with federal procurement law. *See* 5 U.S.C. § 706(2)(A).

## B. *Performance Standard for Subcontracting*

Greenland Contractors and Copenhagen Arctic further aver that the Air Force failed to evaluate the proposals in accord with Section H-6 and PWS 3.1.16 of the Solicitation, which required offerors to "[m]aximize . . . contract-related purchases and subcontracts from Danish and Greenlandic sources" and to "[d]ocument and justify any exceptions." AR 88-5227, 5279; *see also* Greenland Contractors' Mot. at 18-22; Copenhagen Arctic's Mot. at 20-27.[38] Both of these plaintiffs contend that if Per Aarsleff should be awarded the contract, work would be performed by the United States-based subcontractor, [***], *see supra*, at 18 n.23. Greenland Contractors and Copenhagen Arctic argue that the Air Force unreasonably failed to evaluate Per Aarsleff's justification for relying on the United States teaming partner. *See* Greenland Contractors' Mot. at 20; *see also* Copenhagen Arctic's Mot. at 21-22.[39] Per Aarsleff does not deny that it intends to rely on [***] if awarded the Thule Contract. Rather, it aligns itself with

---

[38]Copenhagen Arctic argues that these passages permitted a contractor to subcontract with a foreign entity only when it was "not feasible" to use Danish or Greenlandic sources. *See* Copenhagen Arctic's Mot. at 21. The "feasible" language cited by Copenhagen Arctic can be found in the 2009 Diplomatic Note that amended Article IV of the 1991 MOU. *See* AR 20z-1443. The 2009 Diplomatic Note stated that the two governments "shall procure directly from Danish/Greenlandic sources," but "[w]hen procurement from such sources is not feasible, U.S. requirements may be satisfied by procurement from U.S. or other sources." *Id.* Also pertinent is the 1962 Aide Memoire discussed *supra*, at 5.

[39]In like vein, Greenland Contractors urges that Copenhagen Arctic was also required to justify use of its United States partner, DynCorp International, because that entity would be responsible for performing a significant portion of the work if Copenhagen Arctic had won the award. *See* Greenland Contractors' Mot. at 20. Copenhagen Arctic disagrees and avers that "[a]ll of the subcontractors to be used . . . are ultimately owned by Danish companies," Copenhagen Arctic's Mot. at 22. Copenhagen Arctic does, however, admit that one Danish subcontractor, Burmeister & Wain Scandinavian Contractors ("BWSC"), is ultimately owned by a non-Danish company, *see* Copenhagen Arctic's Reply at 19 n.4 ("In 1990 BWSC's Danish parent company was acquired by a Japanese company."). It also notes that if awarded the contract, it plans to rely on a Swedish company, Volvo Construction Equipment, but only as a "supplier," not as a subcontractor. Copenhagen Arctic does, however, admit that one Danish subcontractor. In response, Exelis Services notes that "under the Federal Acquisition Regulation, a 'subcontactor' is defined as 'any *supplier*, distributor, vendor, or firm that *furnishes supplies* or services to or for a prime contractor or another subcontractor.'" Exelis Services' Reply at 24 n.29 (emphasis in original) (quoting FAR § 44.101).

the government and Exelis Services on this protest ground, arguing that "[S]ection H-6 and PWS 3.1.16 apply only to post-award subcontract arrangements and merely reflect a subjective 'performance standard' to maximize purchases from Danish and Greenlandic sources, not a strict and measurable offeror eligibility requirement or minimum proposal qualification." Per Aarsleff's Mot. at 28-29; *see also* Def.'s Cross-Mot. at 41 ("Copenhagen Arctic and Greenland Contractors' arguments are meritless because offerors were not required to justify their use of United States subcontractors in their proposals."); Exelis Services' Cross-Mot. at 54 ("[T]hese RFP provisions establish performance standards to be used in the administration of the contract, but do not—as Greenland Contractors asserts—establish eligibility or evaluation criteria.").

The court agrees that the RFP provisions cited by Greenland Contractors and Copenhagen Arctic establish post-award performance standards that pertain to administration of the contract and do not create a supplementary evaluation criterion. *See, e.g.*, AR 88-5227. (Section H is titled "Special *Contract* Requirements") (emphasis added).[40]  Indeed, there were no instructions in Section L ("Instructions, Conditions, and Notices to Offerors") to include documentation regarding use of foreign subcontractors, and Section M ("Evaluation Factors for Award") did not require the Air Force to evaluate offerors in accord with PWS 3.1.16. *Cf. Bae Sys. Tech. Solutions & Servs., Inc.*, B-409914, 2014 WL 5804275, at *7 n.5 (Comp. Gen. Sept. 16, 2014) (holding that certain criteria were "not part of the key personnel evaluation under section M of the [task order request], but rather, a performance requirement listed in section H.10 of the [task order request] under personnel training and certification requirement."). And further, the plain text of the Solicitation makes evident that the focus of Section H-6 and PWS 3.1.16 is on "purchases and subcontracts" relating to *products*, not services. *See* AR 88-5277.[41]  Section H notes that "*[p]roducts* not acquired by Danish and/or Greenlandic sources must be procured [in accord with certain identified FAR provisions]," AR 88-5227 (emphasis added), and PWS 3.1.16 requires compliance with FAR § 52.223-2, which governs "Affirmative Procurement of Biobased *Products* Under Service and Construction Contracts," AR 88-5279 (emphasis added).

---

[40]Because Section H-6 and PWS 3.1.16 establish performance standards rather than eligibility criteria, Copenhagen Arctic's reliance on *Technology Servs. Int'l, Inc.*, B-276506, 1997 WL 658746 (Comp. Gen. May 21, 1997), is misplaced. In *Technology Services*, GAO recommended that the Air Force reevaluate proposals because the awardee had not provided a requisite work scheduling system in its proposal. 1997 WL 658746, at *4. There, the work scheduling system was a requirement of the RFP, which stated that an "offeror will be evaluated to assess whether its quality control plan included, among other things, 'a work scheduling system which shows by area the day and time when all requirements covered in the PWS will be accomplished.'" *Id.*, at *2. Contrary to the subcontracting requirement in this Solicitation, the work scheduling system in *Technology Services* was required to be included in the proposal itself; it was not simply a performance requirement as here. *See id.*, at *2, *4.

[41]The Aide Memoire, invoked under Section H-6, reinforces this interpretation. It addressed "[p]articipation of Danish suppliers in the areas of *local purchase items and perishable subsistence*" and provided that "total volume of such *purchases* . . . would be solicited each fiscal year from Danish sources by a purchasing activity located in Copenhagen." AR 20zf-1467 to 1468 (emphasis added).

Read together, these clauses cannot be interpreted to apply to an offeror's proposed teaming arrangement.

Nonetheless, teaming arrangements were important insofar as employment opportunities for Danish and Greenlandic citizens were concerned. Copenhagen Arctic emphasizes that Section M of the Solicitation required compliance with "all stated terms, conditions, representations, certifications, and all other information required by Section L of this [S]olicitation," and "[n]on-compliance with the RFP may be ground to eliminate the proposal from consideration for contract award." Copenhagen Arctic's Mot. at 23 (quoting AR 88-5261, 5254). All four offerors submitted proposals agreeing to comply with paragraph 3.1.16 of the PWS during performance of the contract, *see* AR 173-15049 (Copenhagen Arctic's Proposal Revisions (July 23, 2014)) ("We have no exceptions to the solicitation terms and conditions."); AR 111-7908 (Per Aarsleff's Proposal Revisions (July 3, 2014)) ("We take no exceptions to the terms and conditions included in the solicitation."); AR 153-12281 (Greenland Contractors' Initial Proposal (May 9, 2014)) ("Greenland Contractors I/S has no exceptions to any of the solicitation requirements."); AR 97-6314 (Exelis Services' Initial Proposal (May 9, 2014)) ("Exelis [Services] will comply with all of the Performance Work Statement (PWS) require-ments and takes no exception to any of the terms, conditions, representations, certifications or provisions in this [S]olicitation."). A contracting officer is ordinarily entitled to rely upon such certifications when determining whether to accept a proposal. *See Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011). Even so, the court may inquire whether there was a basis on the face of the offers for the Air Force to conclude that the offerors could not (or would not) comply with Section H or PWS 3.1.16 during contract performance. *See Hyperion*, 115 Fed. Cl. at 553 (finding that the agency should have found proposals to be technically unacceptable where it was readily apparent that the offerors "would not and could not comply with the limitations on subcontracting incorporated into the solicitation") (citing *Centech Grp.*, 554 F.3d at 1038).

Greenland Contractors argues that the court's decision in *Hyperion* "is on all fours with this case . . . [b]ecause it was clear from the face of their proposals that Exelis [Services], Per Aarsleff, and Copenhagen Arctic . . . inten[ded] to [***]." Greenland Contractors' Mot. at 19, 21. In *Hyperion*, a limitation-on-subcontracting clause, set forth in FAR § 52.219-14, was applicable and required that "[a]t least 50% of the cost of the contract performance incurred for personnel shall be expended for employees of the [small business]." *Id.* at 551 (alteration in the original) (citing FAR § 52.219-14(c)(1)).[42] In response, the government avers that *Hyperion* "is easily distinguishable" because PWS 3.1.16 "contains no firm limitation on subcontracting to United States concerns." Def.'s Reply at 12. Additionally, the government contends that there was nothing on the face of the proposals to indicate that the offerors did not intend to comply with the PWS or Section H. *Id.* at 12-13.

--------

[42]"In *Centech*, a contract awardee lost the award upon protest by another offeror because the awardee's proposal stated that it would incur only 43.2% of the contract's labor costs . . . . The court noted that the pertinent question was not whether the awardee *could* comply with the limitation-on-subcontracting clause, but rather whether it *would* comply with the limitation." *Hyperion*, 115 Fed. Cl. at 551 (alteration in original) (citing *Centech Grp.*, 554 F.3d at 1033, 1040).

The court agrees with the government that this case is factually distinguishable from *Centech* and *Hyperion*. The proposals submitted by the offerors for this Solicitation lacked facial indications that the offerors could not or would not maximize the use of Danish or Greenlandic employees during contract performance. Besides submitting proposals agreeing to comply with the terms of the Solicitation during performance of the contract, the proposals submitted by Per Aarsleff, Exelis Services, and Copenhagen Arctic were ostensibly compliant with Section H and PWS 3.1.16. Additionally, the Air Force did make some inquiries into whether teaming arrangements between Danish offerors and American subcontractors provided appropriate opportunities for Danish and Greenlandic employees. The ENs were answered, in at least one instance by a change providing that the Danish contractor and not the American subcontractor would be the employer. Hr'g Tr. 64:11 to 65:8 (May 22, 2015) (describing the EN made to, and the revised proposal submitted by, Copenhagen Arctic).[43] Greenland Contractors contends that the Air Force did not effectively query the other offerors even though it "had . . . in front of it, based on the proposals, . . . strong indications that the[] offerors were not planning to maximize their use of subcontractors from Denmark or Greenland, and, in fact, were going to use their U.S. partners." Hr'g Tr. 46:11-16. There is some validity to the point made by Greenland Contractors about teaming, both respecting Exelis Services and Per Aarsleff, *see* Hr'g Tr. 62:10-25, but those offerors appear to have been planning to [***]. Hr'g Tr. 100:14 to 101:3.

The Air Force specifically acknowledged that Danish and Greenlandic offerors could use United States-based subcontractors to compete for the contract. In response to a question asking whether or not "subcontractors [can] come from . . . the US," the Air Force stated that the "only requirements that the [g]overnment know[s] of until the [Danish Ministry of Foreign Affairs] criteria give more guidance" were that the prime contractor had be a "Danish company" and employees had to be "US or Danish citizens." AR 62-3509 (Industry Day Question Answer Matrix). Absent from this answer was any requirement that subcontractors had to be Danish or Greenlandic. *See id.* Per Aarsleff correctly notes that "these statements from [the Air Force] reinforce the interpretation that the RFP did not prohibit U.S. teaming partners, and that the preference for Danish or Greenlandic subcontractors pertained to acquisition of supplies during performance." Per Aarsleff's Mot. at 32. The government also argues that "[e]xcluding offerors for not justifying their use of United States companies as teaming partners or subcontractors would have introduced unstated evaluation criteria in violation of [FAR] § 15.305(a)." Def.'s Cross-Mot. at 46 (citing *Coburn Contractors, LLC*, B-408279.2, 2013 WL 5718848 (Comp. Gen. Sept. 30, 2013)); *see also* FAR § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

In short, Copenhagen Arctic and Greenland Contractors have not shown that the Air Force misapplied Section H-6 and PWS 3.1.16. The Air Force did not err by failing to disqualify proposals by offerors during the procurement on that ground.[44]

---

[43]Further citations to the transcript of the hearing on the merits will omit the date.

[44]As noted earlier, Greenland Contractors raises two additional claims, *viz.*, that (1) the Air Force engaged in misleading discussions related to Greenland Contractors' proposed pricing, and (2) that the Air Force was obliged to evaluate whether the other offerors had justified their lower pricing. *See* Greenland Contractors' Mot. 28-37. In light of the court's rulings on other

### C.  *Prejudice*

Relief in a bid protest may be available to a protestor that demonstrates not only that there was a significant error in the procurement process but also that it was prejudiced by the error.  *See PGBA, LLC v. United States*, 60 Fed. Cl. 196, 203 (2004), *aff'd*, 389 F.3d 1219 ("To prevail in a bid protest, a disappointed offeror must show both significant error in the procurement process and prejudice to its posture in the process.") (citing *Advanced Data Concepts*, 216 F.3d at 1057).  In this respect, a protestor must show that there was a "substantial chance it would have received the . . . contract award, but for the alleged error in the procurement process."  *McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 712 (2013) (quoting *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 653 (2003)) (citing cases).  This inquiry into "prejudice" is separate from the inquiry into standing, *see supra*, at 25.  "While both use the 'substantial chance' doctrine, prejudice at the jurisdictional threshold can be satisfied on the basis of the plaintiff's allegations, whereas prejudice on the merits can only be satisfied by the effect of an agency decision adjudged to be unlawful."  *Hyperion*, 115 Fed. Cl. at 556 (citing *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 696 (2010)).

Here, the Air Force knowingly awarded the Thule Contract to a wholly-owned shell company created by a non-Danish, non-Greenlandic parent company in contravention of a material term in the Solicitation that prohibited subsidiaries of such entities from competing in the procurement.  The Air Force has indicated that it will conduct a new acquisition at some future date based on new eligibility criteria.  Plaintiffs were prejudiced by the Air Force's error respecting eligibility.  Each of them was a Danish company or a Danish partnership, and each was principally owned by Danish or Greenlandic sources.  Had the Air Force properly applied the eligibility criteria during the procurement, it would have found Exelis Services' proposal to be unacceptable, the plaintiffs would have had a substantial chance of receiving the award, and one of the plaintiffs would have won the competition with a lowest-priced, technically acceptable and eligible proposal.  This second inquiry into prejudice has been satisfied.  *See Hyperion*, 115 Fed. Cl. at 556; *see also Linc Gov't Servs.*, 96 Fed. Cl. at 696.

### D.  *Equitable Relief*

Having found that the Air Force's contractual award was arbitrary, capricious and contrary to the terms of the Solicitation, the court is guided by traditional equitable considerations in addressing if it should grant equitable relief barring the Air Force from giving effect to the improperly granted contract.  In making this determination, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."  *Centech Grp.*, 554 F.3d at 1037 (citing *PGBA*, 389 F.3d at 1228-29).  If all four criteria are satisfied, the court may award declaratory or injunctive relief that is appropriate in the circumstances.  *See* 28 U.S.C. § 1491(b)(2).  The court's determination that the plaintiffs have

---

issues and considering also the court's disposition of the cases, a ruling on Greenland Contractors' further issues is unnecessary.

succeeded on the merits by showing that the Air Force awarded Exelis Services the Thule Contract in contravention of the eligibility criteria of the Solicitation leaves for consideration the other three factors.

It is well-established that the loss of potential work and profits from a government contract constitutes irreparable harm. *See Furniture by Thurston*, 103 Fed. Cl. at 520 (citing *BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677, 696 (2012) (in turn citing *ViroMed Labs., Inc. v. United States*, 87 Fed. Cl. 493, 503 (2009))); *see also* 28 U.S.C. § 1491(b)(2) ("[M]onetary relief [in a bid protest] shall be limited to bid preparation and proposal costs."). The competitive detriment to plaintiffs, stemming from the denial of a fair opportunity to participate in a lawful procurement process, also engenders irreparable harm. *See Hyperion*, 115 Fed. Cl. at 557; *see also Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("[L]oss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm.") (citing cases).

The court must balance the potential harm to plaintiffs in not granting an injunction against the potential harm to the government should an injunction be granted. *See PGBA*, 389 F.3d at 1231-32; *see also Hyperion*, 115 Fed. Cl. at 557. The government indicates that the Air Force "does not want to rush the transition and risk operational issues [with a new contractor phase-in]," and therefore it may extend Greenland Contractors' performance into fiscal year 2016. *See* Def.'s Cross-Mot. at 60, 62. The government estimates that a bridge contract with Greenland Contractors will cost the Air Force [***] more than the price reflected in the contract awarded to Exelis Services. *Id.* at 60-61. Based on its estimates, the government argues that a bridge contract may cost the Air Force an additional "[***] [USD] per month." *Id.* at 61. Alternatively, the government argues that a contractor given an award after the court's decision "would not be able to take over performance until July 2016[,] . . . which would result in another nine months of performance by Greenland Contractors at a cost of approximately $[***] to $[***], plus re-procurement costs and any additional costs resulting from the award to a higher-priced offeror." *Id.* at 63; *see also* Def.'s Reply at 22 n.16 ("[E]ven a two or three month delay and award to [a contractor] would likely cost the Air Force [***].").[45]

Although "[e]conomic harm to the [g]overnment is . . . a relevant factor," Def.'s Reply at 22 (citing cases), the "burden of re[-]procurement costs" occurs whenever an improper award of a contract is set-aside. *See Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 122 (2011) ("[T]he government would, of course, bear . . . the burden of re[-]procurement costs."). Further, even if the Air Force is harmed in the ways the government asserts, such harm is attributable to "delays of [the Air Force's] own creation." *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 155 (2010); *see also Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994) (rejecting the government's attempt "to preserve its ill-gotten gain" and affirming a trial court's injunction that "returned the contract award process to the status quo ante any illegality"). The Air Force "could have forestalled this controversy simply by excluding Exelis Services from the competition when it explicitly informed the agency that it was a wholly-owned subsidiary [of

---

[45]The assertion that a re-procurement may be more expensive because the award may go to a "higher-priced offeror," Def.'s Cross-Mot. at 63, in effect is predicated on using the improper contractual award as a baseline for measuring financial harm.

a U.S. company] (June 2014), or when the [Danish Business Authority] informed AFSPC that it was not possible to register as a foreign subsidiary in the CVR (August 2014)." Per Aarsleff's Mot. at 37. In short, the government has awarded the contract to an ineligible offeror, and it has not demonstrated that the additional financial costs to the Air Force associated with granting injunctive relief outweigh the harm to plaintiffs denied an opportunity to compete based upon properly applied eligibility criteria. *Cf. ARKRAY USA, Inc. v. United States*, 118 Fed. Cl. 129, 138 (2014) (finding that the balance of hardships weighed in bid-protestor's favor, even though the government represented "that it will save as much as $64.8 million per year" if it were allowed to proceed with an award issued in error).

Finally, the public interest in maintaining the integrity of the procurement process weighs heavily in favor of granting a permanent injunction. *See Hyperion*, 115 Fed. Cl. at 557; *see also PGBA*, 60 Fed. Cl. at 221. The public interest is best served by abiding by the required eligibility criteria and evaluative steps in a procurement. *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 514 (2013). Moreover, the Danish and United States governments are currently collaborating to correct the mistake regarding the eligibility criteria. Permitting Exelis Services to continue as the contractor for Thule Air Base and receive the benefits of the Thule Contract not only is inconsistent with these diplomatic discussions, but it "betray[s] the spirit of the [bilateral] agreements and intent of the original eligibility criteria." Per Aarsleff's Mot. at 38.

There is also no reason to believe that an injunction will cause any interruption of vital services to Thule Air Base or affect the critical missions of the base. *See* Greenland Contractors' Reply at 28-29; *see also* Def.'s Cross-Mot. at 60-63 (discussing costs associated with an injunction, but omitting any argument that an injunction would prevent the Air Force from ensuring continuity of service at Thule Air Base); Def's Reply at 21-23 (same).

The requirements for issuance of equitable relief have been satisfied, and the Air Force's contractual award to Exelis Services should be set aside. Despite plaintiffs' urgings, the court declines to provide any more specific instruction to the Air Force regarding its further actions in this procurement.

## CONCLUSION

For the reasons stated, plaintiffs' motions for judgment on the administrative record are GRANTED, and the government's and Exelis Services' cross-motions for judgment on the administrative record are DENIED. The award by the Air Force of the Thule Contract to Exelis Services is set aside, and the Air Force is enjoined from proceeding with that contract. The clerk is directed to issue final judgment in accord with this disposition.

Plaintiffs are awarded their costs of suit.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge